STUART, Justice.
Jerry Jerome Smith was convicted of “[mjurder wherein two or more persons are murdered by the defendant by one act or pursuant to one scheme or course of conduct.” § 13A-5-40(a)(10), Ala.Code 1975. The jury recommended, by a vote of 11 to 1, that Smith be sentenced to death. After a sentencing hearing, the trial court sentenced Smith to death.
The Court of Criminal Appeals affirmed Smith’s conviction, but remanded the case for the trial court to address deficiencies and errors in the sentencing order. Smith v. State, 213 So.3d 108 (Ala.Crim.App.2000). The trial court amended its sentencing order on remand. The Court of Criminal Appeals reviewed the amended order and held that the amendment did not remedy the errors because the trial court had not addressed all of the court’s concerns; it again remanded the case. 213 So.3d 108, 203 (opinion on return to remand). On return to second remand, the trial court submitted a new sentencing order, which the Court of Criminal Appeals determined was adequate. The Court of Criminal Appeals completed its *217 review and affirmed Smith’s death sentence. 213 So.3d 108, 209 (opinion on return to second remand).
The Court of Criminal Appeals presented a detailed synopsis of the facts of the offense and a thorough analysis of the issues presented during the guilt phase of Smith’s trial. We have reviewed the issues raised by Smith regarding the guilt phase of his trial as to which we granted certiorari review,[1] and we agree with the Court of Criminal Appeals that there was no reversible error during the guilt phase; therefore, Smith’s conviction is due to be affirmed. This Court, however, does not wish to be understood as approving all the language, reasons, or statements of law in the Court of Criminal Appeals’ December 22, 2000, opinion addressing the allegations of error in the guilt phase. See Horsley v. Horsley, 291 Ala. 782, 280 So.2d 155 (1973). We conclude, however, that reversible error did occur during the penalty phase of Smith’s trial, and we remand the case for a new penalty-phase proceeding.
I.
According to Smith, the trial court prevented him from introducing relevant and persuasive mitigating evidence in violation of Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and Alabama law. Specifically, he maintains in his brief to this Court that he was denied the opportunity to present evidence to show that
“[h]is family’s role models and caretakers—his mother and father—were an alcoholic and a convict. They were unavailable to protect their children from predators or to provide them with a healthy home environment. Because Jerry Smith’s brothers and sisters also suffered from neglect and trauma, they were unable to offer the sustenance that a sibling can sometimes provide to assist a flailing youngster.”
According to Smith, because the trial court ruled that he could introduce evidence only of things that happened to him and no one else, he was precluded from presenting a complete picture of his childhood.
“We begin by recognizing that the concept of individualized sentencing in criminal cases generally, although not constitutionally required, has long been accepted in this country.... [Wjhere sentencing discretion is granted, it generally has been agreed that the sentencing judge’s ‘possession of the fullest information possible concerning the defendant’s life and characteristics’ is ‘[hjighly relevant—if not essential—[to the] selection of an appropriate sentence .... ’ Williams v. Neto York, [337 U.S. 241], 247 [ (1949) ](emphasis added [in Lockett ]).
[[Image here]]
“... [W]e conclude that the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering as a mitigating factor, any aspect of a defendant’s character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.... Given that the imposition of *218 death by public authority is so profoundly different from all other penalties, we cannot avoid the conclusion that an individualized decision is essential in capital cases. The need for treating each defendant in a capital case with that degree of respect due the uniqueness of the individual is far more important than in noncapital cases.... The nonavailability of corrective or modifying mechanisms with respect to an executed capital sentence underscores the need for individualized consideration as a constitutional requirement in imposing the death sentence.
“There is no perfect procedure for deciding in which cases governmental authority should be used to impose death. But a statute that prevents the sentencer in all capital cases from giving independent mitigating weight to aspects of the defendant’s character and record and to circumstances of the offense proffered in mitigation creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty. When the choice is between life and death, that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments.”
Lockett v. Ohio, 438 U.S. at 602-05 (footnotes omitted). Likewise, a ruling that has not given “independent mitigating weight to aspects of the defendant’s character” creates the same risk.
To determine the appropriate sentence, the sentencer must engage in a “broad inquiry into all relevant mitigating evidence to allow an individualized determination.” Buchanan v. Angelone, 522 U.S. 269, 276, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998). Alabama’s sentencing scheme broadly allows the accused to present evidence in mitigation. Jacobs v. State, 361 So.2d 640, 652-53 (Ala.1978). See 13A-5-45(g), Ala.Code 1975 (“The defendant shall be allowed to offer any mitigating circumstance defined in Sections 13A-5-51 and 13A-5-52.”). “[E]vidence about the defendant’s background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.” California v. Brown, 479 U.S. 538, 545, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987) (O’Con-nor, J., concurring specially).
At the charge conference before the penalty phase of Smith’s trial, Smith’s counsel indicated that Smith would testify that his family was dysfunctional and the effect that his dysfunctional family had on his development. At the charge conference, the following occurred:
“[Prosecutor]: I want to say this evidence about at age 12 the client—I presume the client is Jerry Jerome Smith— [Smith’s siblings] were at home, and [E.L.M.] came in and raped [Smith’s sister], hit [Smith’s brother] in the head with the pliers. Mr. Smith was angry about that incident. That is clearly not admissible. They can’t elicit that.... They can’t get into that. They can’t get into his brother is mentally retarded. They can’t get into his sister tried to commit suicide. They can’t get in that his sister had an alcohol problem or attempted suicide. Mr. Smith’s cousin ... was in a mental institution. That is not relevant at all. They can put up this defendant and his conditions, but not the family....
[[Image here]]
“[Smith’s counsel]: Your Honor, mental retardation is a hereditary factor, certainly, certain aspects of it, without doubt. To show that someone is in [special education] classes, that he has the *219 education ability of a 12 year old, he’s borderline mentally retarded, he has a mild mental deficiency, all of those are weighting factors to substantiate the possibility of him having that problem, which [Smith’s expert witness] testified [during the guilt phase] that he has....
“[Smith’s cocounsel]: Judge, let me refer the Court to Jackson v. Thigpen [752 F.Supp. 1551 (1990) ]. This is [a] Northern District [of] Alabama 1990 case. Let me read you this, ‘Petitioner’s alcoholism, the abuse that she suffered as a child, her limited intelligence, and the circumstances surrounding the killing of her boyfriend all bore upon the mitigating factors of whether petitioner was substantially impaired in her capacity to appreciate the criminality of her conduct.’ ...
«
“[Prosecutor]: They can put in things about him, that he has got a drinking problem, he’s got a mental problem, he tried to kill himself, ... but things about the family are not relevant to mitigating circumstances. That’s what these cases say. Once that gets in, it’s too late to try to change it on behalf of the State.
[[Image here]]
“THE COURT: Okay. I’m going to exclude anything that happened to anybody other than the defendant. And you have fall’s objection to that.
[[Image here]]
“[Smith’s counsel]: What about were your siblings abusive or neglectful to you? Yes, I had a sister in prison. She wasn’t home with me to bond with me. All of that, Judge, I think is relevant.
“THE COURT: No. No.”
During Smith’s direct testimony in the penalty phase, the following occurred:
“[Smith’s counsel]: How many brothers and sisters did you have?
“[Smith]: Well, there is five boys and two girls, and two of them—the oldest one was in prison at the time—
“[Prosecutor]: I object. This was not the question. If the defendant would answer the questions and not ad lib or volunteer stuff, Judge.
“[Smith’s counsel]: We are talking about his family unit here, in other words, his environment as a child. “THE COURT: Okay. I think we talked about that before this hearing, and that is sustained.
[[Image here]]
“[Smith’s counsel]: How old were your other brothers and sisters at home?
“[Smith]: I think my sister was 14, either 13, at the time. And she was pregnant also when she was 13 years old.... My oldest brother was molested, and he’s the mentally retarded one.
“[Prosecutor]: Judge, once again, would you instruct this defendant to answer the question, not volunteer information. He didn’t ask him about those things. He’s rambling off. And we’ve already taken up these matters.
“[Smith’s counsel]: We are not offering these as specific examples of mitigation. We are offering this as the totality of his family unit, which I think is admissible.
“THE COURT: Okay. [Smith’s counsel], we’ve already discussed this. And that is sustained. And the jury is to disregard the testimony in regards to—I forgot what it was now— the sister—
“[Smith’s counsel]: The sister being retarded and the brother being in jail.
“THE COURT: You are not to consider that at this time.”
*220 A little later when his counsel questioned Smith about his biological father, the prosecutor again objected. Smith’s counsel indicated that he thought the evidence was relevant. Before the court could sustain the objection, the prosecutor withdrew his objection. Smith responded, “My role model dad I was supposed to have had was an alcoholic also. And he stayed in jail most of the time and basically couldn’t hold a job down. So it was hard.” In light of the objection and the trial court’s previous rulings, Smith’s counsel did not develop this line of examination to include the effect Smith’s relationship with his father, or the lack of one, had on Smith. The trial court’s ruling during the charge conference and its subsequent ruling during Smith’s testimony were erroneous. A sentencer may not, as a matter of law, preclude or refuse to consider any relevant mitigating factor offered by the defendant. Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); and Lockett, supra. In Price v. State, 725 So.2d 1003, 1062 (Ala.Crim.App.1997), aff'd, 725 So.2d 1063 (Ala.1998), the Court of Criminal Appeals upheld as proper the trial court’s finding as a nonstatutory mitigating circumstance that the defendant’s father was murdered when he was a child and its consideration of “the instability of [the defendant’s] home life and the traumatic events during his early years.” The trial court’s ruling here improperly restricted Smith’s presentation and development of mitigation evidence; consequently, it prevented the jury from determining an individualized sentence recommendation for Smith.
We must now decide whether that error warrants a reversal of the sentence and necessitates a new penalty-phase proceeding. The Court of Criminal Appeals held that despite the trial court’s ruling, Smith was permitted to present evidence regarding his dysfunctional family; therefore, the error, if any, was harmless. The Court of Criminal Appeals noted that Smith presented evidence indicating that Smith’s mother and sister suffered from alcoholism; that his father had been incarcerated while Smith was a child; that his parents were unable to provide a safe home environment; that his brothers and sisters were unable to provide sustenance; that one of his brothers was mentally retarded; that some of his siblings were incarcerated; and that his parents did not visit him while he was incarcerated. We agree with the Court of Criminal Appeals that mitigating evidence was presented. It is clear from the record, however, that Smith was prevented from expanding the evidence to show how his childhood was impacted by the fact that his family was dysfunctional. While he was able to present some evidence about certain members of his family, that evidence was limited and not well developed. As Smith maintains, “At no point was the jury able to learn the key information: what it was like for [him] to grow up in an abusive, neglectful home where no one was able to look after him.” Additionally, the trial court specifically instructed the jury to ignore some of the evidence presented, which, if developed and allowed to be considered by the jury, may have been relevant in the jury’s sentencing recommendation.
“The harmless error rule is to be applied with extreme caution in capital cases. Seibold v. State, 287 Ala. 549, 253 So.2d 302 (1970). We hold that caution must also be observed when reviewing error committed at the penalty phase of the trial. After all, it is the penalty phase which distinguishes these cases from all other cases.”
Ex parte Whisenhant, 482 So.2d 1247, 1249 (Ala.1984).
Smith was prevented from presenting a complete picture of the impact his *221 dysfunctional family had on his development. We cannot maintain judicial integrity and conclude that the error—not allowing that evidence to be developed as nonstatutory mitigating evidence—was harmless. We are not reasonably certain that the outcome of the penalty phase of Smith’s trial would have been the same had the mitigating evidence been developed. As Justice Marshall reminded us in his special writing concurring in the judgment in Lockett, ‘Where life itself is what hangs in the balance, a fine precision in the process must be insisted upon.” 438 U.S. at 620. Smith did not receive the “fíne precision” in the penalty phase of his trial necessary to ensure due process. Therefore, we remand this case for a new penalty-phase proceeding.
In concluding that the error here was not harmless, we have considered the role of the jury during the penalty phase of a capital case. We will not undermine the responsibilities and duties of the jury during the penalty phase. § 13A-5-46, Ala. Code 1975. Although the trial court is not bound by the jury’s sentencing recommendation, it is a factor in the trial court’s determination. § 13A-5-47(e). See also Ex parte Taylor, 808 So.2d 1215 (Ala.2001).
Additionally, we note that while the trial court found Smith’s evidence significant in its determination of mitigating circumstances and considered those mitigating circumstances in the weighing process, this fact alone does not render the error harmless; in fact, it indicates that the jury’s advisory verdict, if the evidence had been developed and the jury allowed to consider it, may have been different.
“‘The legislatively mandated role of the jury in returning an advisory verdict, based upon its consideration of aggravating and mitigating circumstances, can not be abrogated by the trial court’s errorless exercise of its equally mandated role as the ultimate sentencing authority. Each part of the sentencing process is equally mandated by the statute (§§ 13A-5-46, -47(e)); and the er-rorless application by the court of its part does not cure the erroneous application by the jury of its part. For a case consistent with our holding, see Johnson v. State, 502 So.2d 877 (Ala.Cr.App.1987). To hold otherwise is to hold that the sentencing role of the jury, as required by statute, counts for nothing so long as the court’s exercise of its role is without error.’ ”
Ex parte Stewart, 659 So.2d 122, 128 (Ala.1993)(quoting Ex parte Williams, 556 So.2d 744, 745 (Ala.1987)). This case does not present a circumstance where the aggravating circumstances were so numerous and overwhelming that when the aggravating circumstances are weighed against the mitigating circumstances, the error could be considered harmless. Cf. Broadnax v. State, 825 So.2d 134 (Ala.Crim.App.2000), aff'd, 825 So.2d 233 (Ala.2001).
We further note that the prosecutor apparently believed that the development of the mitigating evidence would have some impact on the jury or he would not have so strenuously objected to its admission. Because we do not know, based on the record, how Smith would have developed the evidence, we cannot determine with certainty that it would have had no impact on the jury.
We also reject the contention that because Smith’s counsel indicated at the charge conference that Smith was to be the only witness, the evidence to be offered in mitigation was minimal and the error in not allowing that evidence therefore harmless. We cannot conclude with certainty, especially in light of the prosecutor’s objections, that Smith was able to develop the evidence fully. The record *222 indicates that during the penalty phase, Smith’s mother was present in the courtroom and that defense counsel indicated that she would probably testify. Smith’s mother, however, did not testify. We acknowledge that the trial court did not refuse to allow her to testify and that numerous possible reasons exist for her not testifying. However, we cannot exclude the possibility that her testimony was not elicited because of the trial court’s ruling that what had happened to family members, other than Smith, was not relevant.
Our holding today in no way indicates this Court’s view on the propriety of the sentence of death in this case. “What is important ... is an individualized determination on the basis of the character of the individual and the circumstances of the crime.” Zant v. Stephens, 462 U.S. 862, 879, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). The penalty phase of a capital-murder case is a “ ‘due process hearing of the highest magnitude.’ Richardson v. State, 376 So.2d 205, 224 (Ala.Crim.App.1978), aff'd, 376 So.2d 228 (Ala.1979).” Ex parte Stewart, 659 So.2d at 127. Smith was not afforded due process at the penalty phase of his trial; therefore, we must remand this case.
In light of our remand for a new penalty-phase proceeding, we pretermit any discussion of other errors Smith alleges occurred during the penalty phase.[2] Our pretermission of any discussion of the additional penalty-phase issues upon which we granted certiorari review is not to be understood as approval of all the language, reasons, or statements of law in the Court of Criminal Appeals’ opinion. Horsley, supra.
II.
After the United States Supreme Court issued its holding in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), this Court ordered supplemental briefing to allow the parties to discuss the impact of Ring on Smith’s case. We need not, however, address the implications of the holding in Ring on the Alabama capital-sentencing statutes. Even if Ring draws into question the constitutionality of Alabama’s capital-sentencing scheme, and we are not prepared to say that it does, a Ring violation did not occur in this case.
In his special writing in Bottoson v. Moore, 833 So.2d 693, 719 (Fla.2002), Justice Pariente eloquently explained:
“[T]he presence of a prior violent felony conviction meets the threshold requirement of Apprendi [v. New Jersey, 530 U.S. 466 (2000),] as extended to capital sentencing by Ring [v. Arizona, 536 U.S. 584, 122 S.Ct. 2428 (2002)]. In Almendarez-Torres v. United States, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998), the United States Supreme Court approved an enhanced sentence for the crime of returning to the United States after being deported, based on the judge’s finding that the deportation was pursuant to three prior convictions of aggravated felonies. The Court rejected a claim that the en *223 hancement was improper because the indictment had not alleged that the deportation was pursuant to the prior convictions. As explained in Apprendi, ‘our conclusion in Almendarez-Torres turned heavily upon the fact that the additional sentence to which defendant was subject was “the prior commission of a serious crime.” ’ 530 U.S. at 488, 120 S.Ct. 2348. In Apprendi, the Court held:
“ ‘[TJhere is a vast difference between accepting the validity of a prior judgment of conviction entered in a proceeding in which the defendant had the right to a jury trial and the right to require the prosecutor to prove guilt beyond a reasonable doubt, and allowing the judge to find the required fact under a lesser standard of proof.’
“Id. at 496, 120 S.Ct. 2348. Accordingly, the Court held: ‘Other than the fad of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.’ Id. at 490, 120 S.Ct. 2348 (emphasis supplied [in Botto-son ]).
“In extending Apprendi to capital sentencing, the Court in Ring did not eliminate the ‘prior conviction’ exception arising in Almendarez-Torres. The Court noted in Ring that ‘[n]o aggravating circumstance related to past convictions in his case; Ring therefore does not challenge Almendarez-Torres.’ 536 U.S. at 597 n. 4, 122 S.Ct. at 2437 n. 4.”
833 So.2d at 722-23 (footnote omitted). As was the circumstance in Bottoson, one of the aggravating circumstances presented by the State in the penalty phase of this trial involved a prior felony conviction; therefore, Smith is not entitled to relief pursuant to Ring. See Almendarez-Torres v. United States, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998).
III.
Smith further maintains that this Court must remand his case for a determination as to whether his sentence violates the United States Supreme Court’s recent holding in Atkins v. Virginia, 536 U.S. 304, 317, 122 S.Ct. 2242, 2250, 153 L.Ed.2d 335 (2002), that executing a mentally retarded individual violates the ban on cruel and unusual punishments found in the Eighth Amendment to the United States Constitution. This issue was raised in the supplemental briefing ordered by this Court.
Although this issue was brought to our attention on certiorari review, because Smith did not contend at trial that mental retardation barred the imposition of a death sentence upon him we apply the plain-error standard of review. See Rule 39(a)(2)(D), Ala.R.App.P.
“‘[TJhis Court’s review of a death-penalty case allows us to address any plain error or defect found in the proceeding under review, even if the error was not brought to the attention of the trial court. Rule 39(a)(2)(D) and (k), Ala. R.App. P. “‘“Plain error” only arises if the error is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings.’ ” Ex parte Womack, 435 So.2d 766, 769 (Ala.), cert. denied, Womack v. Alabama, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983), quoting United States v. Chaney, 662 F.2d 1148, 1152 (5th Cir.1981). The plain-error standard applies only where a particularly egregious error occurs at trial. Ex parte Harrell, 470 So.2d 1309, 1313 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985). When the error “has or probably has” *224 substantially prejudiced the defendant, this Court may take appropriate action. Rule 39(a)(2)(D) and (k), Ala. R.App. P.; Ex parte Henderson, 583 So.2d 305, 306 (Ala.1991), cert. denied, Henderson v. Alabama, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992).’
“Ex parte Minor, 780 So.2d 796, 799-800 (Ala.2000)(footnote omitted).”
Ex parte Perkins, 851 So.2d 453, 454-55 (Ala.2002).
We reject Smith’s contention that in light of the holding in Atkins, we must remand this cause for the trial court to conduct a hearing to determine if he is mentally retarded and therefore not subject to the death penalty. Plain error did not occur in that regard in this case.
Because the Legislature has not had an occasion to address this State’s policy regarding mentally retarded capital defendants and establish a procedure for determining whether a capital defendant is mentally retarded and therefore not subject to the death penalty, we have conducted our review in light of the most liberal definitions considered by the United States Supreme Court in reaching its holding in Atkins and as defined by statutes in those states that prohibit the imposition of the death sentence on a mentally retarded defendant.[3]
Based on the facts presented at Smith’s trial, under even the broadest definition of mental retardation Smith is not mentally retarded. Those states that have statutes prohibiting the execution of a mentally retarded defendant require that to be considered mentally retarded a defendant must have significantly subaver-age intellectual functioning (an IQ score of 70 or below) and significant or substantial deficits in adaptive behavior. Additionally, those problems must have manifested themselves before the defendant reached age 18.
The record establishes that during the guilt phase of trial, the State and Smith presented expert testimony regarding Smith’s intellectual functioning and adaptive behavior. Dr. Don Crook, a licensed professional counselor, testified as a witness for the defense. Dr. Crook interviewed Smith and administered the Wechsler Adult Intelligence Scale—Revised when Smith was 26 years old. Dr. Crook testified that Smith was “very cooperative, very pleasant and social.” Dr. Crook testified that Smith was mildly mentally retarded with a full-scale IQ score of 72. (Smith’s verbal IQ score was 76; his performance IQ score was 69.) Dr. Crook further maintained that his testing indicated that Smith had an “adjustment disorder with mixed disturbance of emotions” and that Smith suffered from “poly-substance dependence.” The record indicates that according to the results of a Stanford-Binet Intelligence Scale administered to Smith when he was 12 years old, his full-scale IQ score at that time was 66. Dr. Crook concluded that Smith read and spelled on a first-grade level, that his math *225 skills were on a third-grade level, and that his ability to form intent was at the level of a 10- to 12-year-old. Dr. Crook further testified that Smith knew that it was against the law and wrong to shoot and kill someone and that it was against the law to sell drugs.
Dr. Crook admitted that his conclusions did not take into consideration Smith’s articulate statement made to the police after he was arrested for the murders; the facts surrounding the murders, which indicate intentional, goal-oriented behavior; Smith’s relationship with his girlfriend; or Smith’s statements while he was in jail awaiting trial to the effect that he had committed the murders and that he would “get off’ on a plea of mental disease or defect.
Dr. Michael D’Errico, a forensic psychologist, testified for the State. Dr. D’Errico concluded that Smith was mildly mentally deficient. Dr. D’Errico explained:
“When I reviewed Mr. Smith’s case, I found that he was living independently at a level, probably, higher than a mentally retarded individual would be living, Therefore, I was at a loss to come up with a diagnosis of mental retardation. However, his score on the intelligence test placed him in the mild range of mental deficiency.”
According to Dr. D’Errico, Smith was “street-wise” or “street-smart.”
The testimony with regard to Smith’s intellectual functioning indicates that he falls within the borderline to mildly mentally retarded range with an overall IQ score of 72 a year after the murders, which seriously undermines any conclusion that Smith suffers from significantly subaver-age intellectual functioning as contemplated under even the broadest definitions.
Likewise, with regard to evidence of “significant” or “substantial” deficits in adaptive behavior, our review of the record indicates little, if any, deficit. At the time of the murders, Smith had had an ongoing year-long relationship with his girlfriend. His articulate testimony indicates that he loved his girlfriend, maintaining that she had been his “common-law wife” for a year, and that they had planned on having children. Additionally, we note that the evidence indicates that before Smith shot the first victim, he told his girlfriend to move out of harm’s way.
Moreover, the record indicates that before the murders Smith was able to hold various jobs. At the time of the murders, Smith was working a construction job. More insightful into Smith’s adaptive behavior is the fact that Smith was involved in an interstate illegal-drug enterprise. Smith testified that at the time of the murders he was under stress because he owed a Jamaican drug supplier in Jacksonville, Florida, $27,000. Smith admitted that at the time of the murders he was addicted to cocaine and that he was using $400 worth of crack cocaine per day; he said that in order to maintain that habit he “distributed” drugs.
Furthermore, the fact that Smith gave a police officer a false name two days before the murders when he was stopped for a traffic violation, the circumstances surrounding the murders, Smith’s actions after the murder—enlisting the help of a friend to dispose of the gun and to hide from the police—his bragging about the murders, his statement about “getting off’ using a mental-disease-or-defect defense, and his statement that he shot two of the individuals in the house to eliminate witnesses indicate that Smith does not suffer from deficits in his adaptive behavior.
Lastly, because the evidence does not support Smith’s contention that he mani *226 fested subaverage intellectual functioning and significant deficits in adaptive behavior, we need not address the third factor— whether those problems evinced themselves before Smith was 18 years old.
Because the record does not support Smith’s contention that he falls within the parameters of the most liberal requirements to support a finding of mental retardation, we reject his contention that we must remand this cause for resentencing on this ground. Applying the plain-error standard of review, we hold that no reversible error occurred in this regard and a death sentence may be imposed in this case if such a sentence is deemed proper after the new penalty-phase proceeding.
For the foregoing reasons, the judgment of conviction for capital murder is affirmed, but the sentence of death is reversed, and the cause is remanded for the Court of Criminal Appeals to remand the cause to the trial court for a new penalty-phase proceeding before a jury.
AFFIRMED AS TO CONVICTION; REVERSED AS TO SENTENCE; AND REMANDED.
HOUSTON, SEE, LYONS, BROWN, JOHNSTONE, HARWOOD, and WOODALL, JJ., concur.
MOORE, C.J., concurs in part and dissents in part.

.This Court issued a writ of certiorari to the Court of Criminal Appeals to review the following guilt-phase issues:
1. Whether the trial court erred in removing certain potential jurors from the venire.
2. Whether the prosecutor’s statements about Smith’s confession, the trial court’s admission of testimony regarding his suppression hearing, and the trial court’s failure to instruct the jury on how to consider his confession were reversible error.
3,Whether the prosecutor engaged in misconduct, resulting in reversible error.

.In addition to the error already addressed, this Court granted certiorari review of the following penalty-phase issues:
1. Whether the trial court erred in failing to instruct the jury that Smith's capacity "to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.” See § 13A-5-51(6), Ala.Code 1975.
2. Whether the evidence supported the aggravating circumstance that Smith "knowingly created a great risk of death to many persons.” See § 13A-5-49(3), Ala.Code 1975,
3. Whether the trial court erred in admitting evidence of his prior convictions.
4. Whether there was prosecutorial misconduct, and, if so, whether that misconduct resulted in reversible error.

. See Ariz.Rev.Stat. § 13-703.02(J)(2) (2001); Ark.Code Ann. § 5-4-618 (Michie 1993); Colo.Rev.Stat. § 18-1.3-1101(2) (2002); Conn. Gen.Stat, § 1-1 g (2001); Fla. Stat. Ann. § 921.137(1) (West 2002); Ga.Code Ann. § 17-7-131(a)(3) (1997); Ind.Code. § 35-36-9-2 (1998); Kan. Stat. Ann. § 21-4623(e) (1995); Ky.Rev.Stat. Ann. § 532.130(2) (Michie 1999); Md.Code Ann., Crim. Law § 2-202 (2002); Mo.Rev.Stat. § 565.030(6) (2001); Neb.Rev.Stat. § 28-105.01(3) (2000); N.M. Stat. Ann. § 31-20A-2.1(A) (Michie 2000); N.Y.Crim. Proc. Law § 400.27(12)(e) (McKinney 2002); N.C. Gen.Stat. § 15A-2005(a)(l)(a)(2001); S.D. Codified Laws § 23A-27A-26.2 (Michie 2002); Tenn.Code. Ann. § 39-13-203(a) (1997); Wash. Rev.Code § 10.95.030(2)(a)(2002),