SHAW, JUDGE,
dissenting.
I agree with the majority that the Alabama Supreme Court’s opinion in Ex parte Smith, 213 So.3d 214 (Ala.2003), did not preclude relitigation of the Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), issue on remand. However, that Court’s opinion is, in my view, subject to differing interpretations and, based on the record, it is unclear to me whether the trial court understood that the Atkins issue was viable on remand, or whether it believed any evidence of mental retardation would be relevant only as a mitigating circumstance.
Before the penalty proceedings on remand, Smith filed three motions requesting that a sentence of life imprisonment without the possibility of parole be imposed pursuant to Atkins; two of those motions also requested a pretrial hearing on the issue. The trial court denied the first motion several months before trial, but granted Smith funds for IQ testing, thus indicating that the trial court believed that the Atkins issue was still viable. During a break in voir dire examination, the trial court deferred ruling on the second two motions until it heard the evidence of Smith’s retardation, again indicating that it believed that the Atkins issue was viable, but it denied Smith’s request for a pretrial hearing on the issue in contravention of this Court’s opinion in Morrow v. State, 928 So.2d 315 (Ala.Crim.App.2004), released over two months before the remand proceedings, holding that an Atkins issue should be determined before trial, thus indicating that the trial court believed that any evidence of mental retardation would not preclude imposition of the death penalty, but could be used only as mitigation evidence. There is no further mention in the record of these motions, and the trial court did not issue a specific ruling on the motions.
In its sentencing order, in finding that Smith’s capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired, see § 13A-5-51(6), Ala.Code 1975, the trial court found that Smith was “borderline mentally retarded” and had a “low IQ” (C. 605-06; emphasis added), but it then found as a nonstatutory mitigating circumstance, see § 13A-5-52, Ala.Code 1975, that Smith was “mildly mentally retarded.” (C. 607; emphasis added.) I note, however, that its sentencing order after the penalty proceedings on remand is in large part identical to the sentencing order the court issued after the first penalty proceedings. The court made no specific findings of fact regarding Smith’s intellectual functioning or adaptive behavior in its sentencing order and, indeed, it did not even mention the Atkins decision, and despite its findings of mental retardation, the court nevertheless imposed the death penalty.
Moreover, the evidence regarding Smith’s mental retardation is sharply conflicting. Although Smith presented both lay and expert testimony to the effect that *238 he was mentally retarded, the State presented both lay and expert testimony to the effect that he was not. The evidence indicated that, at various points in his life, Smith had had IQ scores of between 61 and 72. As the Supreme Court noted, “an overall IQ score of 72 a year after the murders ... seriously undermines any conclusion that Smith suffers from significantly subaverage intellectual functioning.” Ex parte Smith, 213 So.3d at 225. Although the majority finds Dr. D’Errico’s change of testimony compelling, a review of his testimony at the proceedings on remand indicates that the sole basis for his change of opinion was Smith’s childhood IQ scores because, according to Dr. D’Er-rico, IQ scores are the “primary factor” to consider in determining whether a person is mentally retarded. (R. 1149.) Yet, at the original trial, Dr. D’Errico testified that it was Smith’s adaptive behavior and his ability to live “independently at a level, probably, higher than a mentally retarded individual would be living,” that led to his inability, at that time, to find Smith to be mentally retarded.[2] (Original Record, R. 1598.) In addition, Dr. McKeown testified on remand that adaptive functioning is just as important as an IQ score in determining mental retardation. On remand, Dr. D’Errico did not speak to Smith’s level of adaptive functioning, as he did at the original trial, other than to state that Smith was high functioning and to confirm his previous opinion that Smith was “streetwise.” With respect to Smith’s adaptive functioning, evidence indicated that Smith was raised in a dysfunctional, neglectful, and poverty-stricken home; that he had difficulty fitting in at school because of his home environment; and that many of his relatives are mentally retarded and/or suffer from mental illness. However, other evidence indicated that when he was 10, 11, and 14, Smith was tested for adaptive skills and scored above the mental-retardation range of adaptive functioning; that he held various jobs throughout his life; that he was able to live alone and take care of himself, including managing his money, paying his bills, and even paying child support; and that he had a long-time girlfriend. In addition, as the Supreme Court noted in Ex parte Smith:
“More insightful into Smith’s adaptive behavior is the fact that Smith was involved in an interstate illegal-drug enterprise. Smith testified that at the time of the murders he was under stress because he owed a Jamaican drug supplier in Jacksonville, Florida, $27,000. Smith admitted that at the time of the murders he was addicted to cocaine and that he was using $400 worth of crack cocaine per day; he said that in order to maintain that habit he ‘distributed’ drugs.
“Furthermore, the fact that Smith gave a police officer a false name two days before the murders when he was stopped for a traffic violation, the circumstances surrounding the murders, Smith’s actions after the murder—enlisting the help of a friend to dispose of the gun and to hide from the police—his bragging about the murders, his statement about ‘getting off using a mental-disease-or-defect defense, and his statement that he shot two of the individuals in the house to eliminate witnesses indicate that Smith does not suffer from deficits in his adaptive behavior.”
*239 213 So.3d at 225. In determining that Smith “had significant or substantial deficits in adaptive behavior,” the majority does not acknowledge any of these factors the Supreme Court found significant when it determined that Smith had little or no deficits in his adaptive behavior.
“Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus” prohibiting the death penalty. Atkins v. Virginia, 536 U.S. 304, 317, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). The question is not whether Smith could be considered to have some level of mental retardation based on his IQ scores, but whether he is so impaired as to fall within the range of mentally retarded offenders for which the death penalty is prohibited. Such a question involves a factual finding based on weight and credibility determinations, determinations that are better left in the first instance to the trial court, which had the opportunity to personally observe the witnesses and assess their credibility.
Given that the Supreme Court’s opinion in Ex parte Smith is subject to differing interpretations regarding the viability of relitigating the Atkins issue on remand, the ambiguity in the record regarding the trial court’s understanding of whether Atkins could be relitigated on remand, the inconsistencies in the trial court’s findings of both borderline and mild mental retardation, and the conflicting evidence of Smith’s mental retardation, I believe it would be better at this point to remand this case for the trial court to issue specific written findings of fact regarding Smith’s level of mental retardation in light of Atkins and its Alabama progeny before holding as a matter of law, based on our own credibility choices made from review of a cold record, that Smith is mentally retarded to the extent he is ineligible' for the death penalty. Only after findings are made by the trial court can this Court then properly review those findings under the abuse-of-discretion standard enunciated in Morrow.
For these reasons, I respectfully dissent.

. The fact that Dr. D'Errico appears to have changed his mind not only as to his opinion of Smith's mental retardation, but also as to the importance of adaptive functioning in determining mental retardation creates, in my mind, a question of credibility that should be determined by the trial court, not this Court.