On Remand from the Alabama Supreme Court

PATTERSON, Retired Appellate Judge.
The appellant, Jerry Jerome Smith, was convicted of “[mjurder wherein two or more persons are murdered by the defendant by one act or pursuant to one scheme or course of conduct,” § 13A-5-40(a)(10), Ala.Code 1975. The jury recommended, by a vote of 11 to 1, that the appellant be sentenced to death. After a sentencing hearing, the trial court sentenced the appellant to death.
*228 On August 31, 2001, after twice remanding this case for the trial court to address deficiencies and errors in its sentencing order, this Court affirmed the appellant’s conviction for capital murder and his sentence of death. Smith v. State, 213 So.3d 108, 209 (Ala.Crim.App.2000) (opinion on return to second remand). The Alabama Supreme Court granted certiorari review and, on March 14, 2003, affirmed the appellant’s conviction, but reversed the appellant’s sentence of death and remanded the case to this Court with the instruction that this case be remanded to the trial court for a new penalty-phase proceeding before a jury. Ex parte Smith, 213 So.3d 214 (Ala.2003). The Supreme Court overruled the application for rehearing on May 23, 2003.[1]
In accordance with the Supreme Court’s instruction, we reverse the appellant’s sentence of death and remand this case for the trial court to conduct a new sentencing hearing before a jury. The trial court should take the necessary action to ensure that the circuit clerk makes due return to this Court within 140 days from the date of this opinion, or as soon as practicable.
The foregoing opinion was prepared by Retired Appellate Judge John Patterson while serving on active duty status as a judge of this Court under the provisions of § 12-18-10(e), Ala.Code 1975.
AFFIRMED AS TO CONVICTION; REVERSED AS TO SENTENCE; AND REMANDED WITH DIRECTIONS.
McMILLAN, P.J., and COBB, BASCHAB, and WISE, JJ., concur. SHAW, J., recuses himself.

On Return to Remand

BASCHAB, Judge.
The appellant, Jerry Jerome Smith, was convicted of capital murder for murdering two or more people by one act or pursuant to one course of conduct. See § 13A-5-40 (a)(10), Ala.Code 1975. By a vote of 11-1, the jury recommended that he be sentenced to death. The trial court accepted that recommendation and sentenced him to death.
On August 31, 2001, after twice remanding this case for the trial court to correct its sentencing order, we affirmed the appellant’s conviction and sentence of death. See Smith v. State, 213 So.3d 108, 209 (Ala.Crim.App.2000) (opinion on return to second remand). On March 14, 2003, the Alabama Supreme Court affirmed the appellant’s conviction, but reversed his sentence of death and remanded the case to this court with the instruction that we remand the case to the trial court for a new penalty phase proceeding, See Ex parte Smith, 213 So.3d 214 (Ala.2003).
On remand, the trial court conducted a new penalty phase proceeding. By a vote of 10-2, the jury recommended that the appellant be sentenced to death. The trial court accepted the jury’s recommendation and sentenced him to death.
After we affirmed the appellant’s conviction and sentence and after the Alabama Supreme Court granted his petition for certiorari review, the United States Supreme Court released its decision in Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). In Atkins, the Supreme Court held:
“We are not persuaded that the execution of mentally retarded criminals will *229 measurably advance the deterrent or the retributive purpose of the death penalty. Construing and applying the Eighth Amendment in the light of our ‘evolving standards of decency,’ we therefore conclude that such punishment is excessive and that the Constitution ‘places a substantive restriction on the State’s power to take the life’ of a mentally retarded offender. Ford, [v. Wainwright], 477 U.S. [399,] 405, 106 S.Ct. 2595, 91 L.Ed.2d 335 [ (1986) ].”
536 U.S. at 321, 122 S.Ct. at 2252.
The appellant argues that his sentence of death is unconstitutional because he is mentally retarded. When it rejected a similar argument on certiorari review, the Alabama Supreme Court explained:
“We reject Smith’s contention that in light of the holding in Atkins, we must remand this cause for the trial court to conduct a hearing to determine if he is mentally retarded and therefore not subject to the death penalty. Plain error did not occur in that regard in this case.
[[Image here]]
“The record establishes that during the guilt phase of trial, the State and Smith presented expert testimony regarding Smith’s intellectual functioning and adaptive behavior. Dr. Don Crook, a licensed professional counselor, testified as a witness for the defense. Dr. Crook interviewed Smith and administered the Wechsler Adult Intelligence Scale—Revised when Smith was 26 yeai’s old. Dr. Crook testified that Smith was ‘very cooperative, very pleasant and social.’ Dr. Crook testified that Smith was mildly mentally retarded with a full-scale IQ score of 72. (Smith’s verbal IQ score was 76; his performance IQ score was 69.) Dr. Crook further maintained that his testing indicated that Smith had an ‘adjustment disorder with mixed disturbance of emotions’ and that Smith suffered from ‘poly-substance dependence.’ The record indicates that according to the results of a Stanford-Binet Intelligence Scale administered to Smith when he was 12 years old, his full-scale IQ score at that time was 66, Dr. Crook concluded that Smith read and spelled on a first-grade level, that his math skills were on a third-grade level, and that his ability to form intent was at the level of a 10- to 12-year-old. Dr. Crook further testified that Smith knew that it was against the law and wrong to shoot and kill someone and that it was against the law to sell drugs.
“Dr. Crook admitted that his conclusions did not take into consideration Smith’s articulate statement made to the police after he was arrested for the murders; the facts surrounding the murders, which indicate intentional, goal-oriented behavior; Smith’s relationship with his girlfriend; or Smith’s statements while he was in jail awaiting trial to the effect that he had committed the murders and that he would ‘get off on a plea of mental disease or defect.
“Dr. Michael D’Errico, a forensic psychologist, testified for the State. Dr. D’Errico concluded that Smith was mildly mentally deficient, Dr. D’Errico explained:
“ When I reviewed Mr. Smith’s case, I found that he was living independently at a level, probably, higher than a mentally retarded individual would be living. Therefore, I was at a loss to come up with a diagnosis of mental retardation. However, his score on the intelligence test placed him in the mild range of mental deficiency.’
“According to Dr. D’Errico, Smith was ‘street-wise’ or ‘street-smart.’
*230 “The testimony with regard to Smith’s intellectual functioning indicates that he falls within the borderline to mildly mentally retarded range with an overall IQ score of 72 a year after the murders, which seriously undermines any conclusion that Smith suffers from significantly subaverage intellectual functioning as contemplated under even the broadest definitions.
“Likewise, with regard to evidence of ‘significant’ or ‘substantial’ deficits in adaptive behavior, our review of the record indicates little, if any, deficit. At the time of the murders, Smith had had an ongoing year-long relationship with his girlfriend. His articulate testimony indicates that he loved his girlfriend, maintaining that she had been his ‘common-law wife’ for a year, and that they had planned on having children. Additionally, we note that the evidence indicates that before Smith shot the first victim, he told his girlfriend to move out of harm’s way.
“Moreover, the record indicates that before the murders Smith was able to hold various jobs. At the time of the murders, Smith was working a construction job. More insightful into Smith’s adaptive behavior is the fact that Smith was involved in an interstate illegal-drug enterprise. Smith testified that at the time of the murders he was under stress because he owed a Jamaican drug supplier in Jacksonville, Florida, $27,000. Smith admitted that at the time of the murders he was addicted to cocaine and that he was using $400 worth of crack cocaine per day; he said that in order to maintain that habit he ‘distributed’ drugs.
“Furthermore, the fact that Smith gave a police officer a false name two days before the murders when he was stopped for a traffic violation, the circumstances surrounding the murders, Smith’s actions after the murder—enlisting the help of a friend to dispose of the gun and to hide from the police—his bragging about the murders, his statement about ‘getting off using a mental-disease-or-defect defense, and his statement that he shot two of the individuals in the house to eliminate witnesses indicate that Smith does not suffer from deficits in his adaptive behavior.
“Lastly, because the evidence does not support Smith’s contention that he manifested subaverage intellectual functioning and significant deficits in adaptive behavior, we need not address the third factor—whether those problems evinced themselves before Smith was 18 years old.
“Because the record does not support Smith’s contention that he falls within the parameters of the most liberal requirements to support a finding of mental retardation, we reject his contention that we must remand this cause for re-sentencing on this ground. Applying the plain-error standard of review, we hold that no reversible error occurred in this regard and a death sentence may he imposed in this case if such a sentence is deemed proper after the neiv penalty-phase proceeding. ”
Ex parte Smith, 213 So.3d at 224-26 (emphasis added).
The State argues that the appellant cannot relitigate this issue because the Alabama Supreme Court considered and rejected it in his first appeal. However, the Alabama Supreme Court reversed and remanded for a new sentencing proceeding because the appellant “was prevented from presenting a complete picture of the impact his dysfunctional family had on his development.” Ex parte Smith, 213 So.3d at 220-21. Contrary to the State’s argument, the supreme court could not realis *231 tically have pretermitted discussion of the question of whether the appellant was mentally retarded. Rather, it was required to make an initial determination on this issue based on the record before it because, if it had determined that the appellant was mentally retarded, it would have been pointless to remand for a new penalty phase proceeding during which the only permissible sentence would have been imprisonment for life without the possibility of parole.
Moreover, the appellant’s original trial preceded the United States Supreme Court’s decision in Atkins. Therefore, even though he presented evidence concerning mental retardation as mitigation during his original trial, he did not have the opportunity to fully factually develop his claim in the trial court in light of Atkins and its progeny. As we noted in Morrow v. State, 928 So.2d 315, 321 (Ala.Crim.App.2004):
“Because [the appellant] was convicted and sentenced before the decision in Atkins was released, his presentation of evidence at the penalty phase of the trial was naturally focused on establishing circumstances in mitigation of the death penalty, not on establishing that he was constitutionally ineligible for the death penalty.”
For these reasons, we reject the State’s argument that this court does not have jurisdiction to reconsider the appellant’s Atkins claim.
In Atkins, the Supreme Court noted:
“The American Association on Mental Retardation (AAMR) defined mental retardation as follows: ‘Mental retardation refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18.’ Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th ed.1991).
“The American Psychiatric Association’s definition is similar: ‘The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A), that is accompanied by significant limitations in adaptive functioning in at least of two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system.’ Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed.2000). ‘Mild’ mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70. Id. at 42^13.”
536 U.S. at 308 n. 3, 122 S.Ct. at 2245 n. 3. The Supreme Court also stated:
“[C]linical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18. Mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial. Because of their impairments, however, by definition they have *232 diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reaction of others. There is no evidence that they are more likely to engage in criminal conduct than others, but there is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders. Their deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability.”
536 U.S. at 318, 122 S.Ct. at 2250-51 (footnotes omitted). Finally, the Supreme Court stated:
“ ‘[W]e leave to the Statefs] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.’ [Ford v. Wainwright, 477 U.S. 399,] 405, 416-17, 106 S.Ct. 2595 [ (1986) ].”
536 U.S. at 317, 122 S.Ct. at 2250.
Our Legislature has not established a method for deciding whether a capital defendant is mentally retarded as contemplated by Atkins and therefore not eligible for the death penalty. At most, Alabama has the “Retarded Defendant Act,” § 15-24-1 et seq., Ala.Code 1975. Section 15-24-2(3), Ala. Code 1975, defines a mentally retarded person, for purposes of the Act, as “[a] person with significant subaverage general intellectual functioning resulting in or associated with concurrent impairments in adaptive behavior and manifested during the developmental period, as measured by appropriate standardized testing instruments.” Finally, in Ex parte Perkins, 851 So.2d 453, 456 (Ala.2002), the Alabama Supreme Court held:
“[A] defendant, to be considered mentally retarded, must have significantly subaverage intellectual functioning (an IQ of 70 or below), and significant or substantial deficits in adaptive behavior. Additionally, these problems must have manifested themselves during the developmental period (i.e., before the defendant reached age 18).”
On remand, the defense presented the following evidence in support of its claim that the appellant is mentally retarded:
Charles Davis, a neighbor who had known the appellant practically all of his life, testified that the appellant played with his sons when he was small and that he kept the appellant around him a lot; that the appellant’s ability to comprehend and to respond to things was not like that of a normal child; that he first started noticing the problems when the appellant was about nine years old; that the appellant had problems functioning in the community because he read and wrote on about a second- or third-grade level; and that the appellant could carry on a mild conversation with another person. He also testified that he believed that the appellant’s mother, an uncle, and all but one of his brothers and sisters were mildly mentally retarded or slow. Finally, he stated that, based on his experience with children and particularly those with disabilities, he believed that the appellant was mildly retarded.
Fred Davis, Charles Davis’ son, testified that he grew up with the appellant; that the appellant was in special education classes; that the appellant tried to fit in with people, but that he did not; that the appellant’s house was filthy and almost uninhabitable; that the appellant usually smelled bad and was not clean; that the appellant’s brothers and sisters were mentally retarded; and that he would classify the appellant as being mentally retarded. *233 He also testified that the appellant could not read and could only print his name.
Napoleon Bradley, a neighbor who knew the appellant and his family, testified that most of the family was slow; that the appellant was slow; and that the appellant had always been willing to help him work on vehicles, but did not have the ability to work without supervision.
The defense also presented evidence that the appellant was born on February 16, 1971, and was the seventh child in the family; that the appellant’s half-brother Darrin had an IQ of 65 and had been diagnosed as being mildly mentally retarded; that the appellant’s half-brother Arles-ter had been diagnosed as being severely retarded; and that the appellant’s sister Mary was mentally slow and received a disability check. The defense further presented evidence that the appellant’s mother was neglectful toward her home and children at times and was mentally limited, that she was an alcoholic, that she had repeated run-ins with other people, and that law enforcement officers knew her and her family well.
David Glanton, a teacher who was employed by the Henry County Board of Education, testified that the appellant was placed in special education classes because he was classified as educably mentally retarded (“EMR”). He also testified that grades for special education students were assigned on a sliding scale based on the grade level at which the child was functioning.
School records showed that the appellant achieved an IQ score of 61 when he was eight years old. The appellant’s Stanford Achievement Test scores reflected that, whén he was ten years old, he was at 1.0 grade equivalent in reading and 1.6 grade equivalent in math; that, when he was eleven years old, he was at 1.3 grade equivalent in reading and 2.0 grade equivalent in math; and that, when he was twelve years old, he was at 2.9 grade equivalent in reading and 4.4 grade equivalent in math. When he was fourteen years old, the appellant’s performance on the Stanford Achievement Test was below average on 43 of 47 areas and average on 4 of 47 areas. When he was fifteen years old, the appellant’s performance on the Stanford Achievement Test was below average on 42 of 47 areas and average on 5 of 47 areas.
Dr. Frank Weathers, a clinical psychologist, testified that he reviewed numerous records concerning the appellant’s upbringing and history to attempt to explain his actions. Based on that review, he stated that standardized intelligence tests were repeatedly administered to the appellant and that he had low IQ scores that were “very, very consistent at a very early age”; that the appellant “is mentally deficient in the range of 60 to 70 on standardized IQ tests”; that the appellant started using drugs at a very early age; that the appellant’s family had poor interactions with peers and within the family; and that the appellant and his family lived in extreme poverty. (R. 1057,1091.)
Dr. Michael D’Errico, a forensic psychologist, testified that he had previously conducted over 5,000 psychological evaluations; that he had been appointed by the court in about 500 eases; and that he performed a psychological evaluation of the appellant in this case on July 23, 1997. At that time, he administered the Wech-sler Adult Intelligence Scale—Revised (‘WAIS-R”), and the appellant achieved a full-scale score of 67, “which falls near the upper limit of mild range of mental retardation.” (R. 1123.) The appellant’s performance IQ was 70, and his verbal IQ was 67. D’Errico explained that the highest score a person could achieve and still be considered mentally retarded is 70.
*234 D’Errico testified that, in his opinion, the appellant is mildly mentally retarded. He admitted that he had previously determined that the appellant was mildly mentally deficient, although he could not explain why, but had not been able to conclude that he was mentally retarded. However, he explained that, at that time, he did not have any documentation to show that the appellant had been in special education classes, that he had access to the appellant’s school records only on the day of the previous trial proceedings in this case, that he did not have any access to IQ scores, and that he “didn’t have enough information to use the formal term mild mental retardation.” (R. 1135.)
Regarding the appellant’s IQ, D’Errico conceded that he had previously described the appellant as mildly mentally deficient rather than mentally retarded “mainly because [he] lacked clear evidence of a low IQ that was obtained prior to age 18.” (R. 1132.) However, shortly before the new sentencing proceeding, he received school records that showed that the appellant had an IQ of 61 when he was eight years old. D’Errico also admitted that, in September 1997, another doctor administered the same IQ test he had used, and the appellant achieved an overall score of 72 on that test, with a verbal IQ of 76 and a performance IQ of 69. However, he explained that the instructions for the WAIS-R warn that the test should not be administered within six months after it is first administered.
Regarding adaptive behavior, D’Errico admitted that he had previously described the appellant as “street-wise or street-smart.” (R. 1132.) However, he testified that he now considers the appellant to be a high functioning mentally retarded person. D’Errico explained that, when he formed his initial opinion, he looked more at the appellant’s functioning level as an adult. As he further explained, improving learning and adaptive functioning is
“the entire goal of the educably mentally retarded program that you have heard so much about in schools. These are high-functioning mentally retarded children with their IQ scores between a 60 or 70. And the goal in the EMR program is to provide these individuals with some type of skills and some level of adaptive functioning so they can, at least, function marginally in society.”
(R. 1150.) He also testified that some mentally retarded people can improve their adaptive functioning to a point where they can function, at least marginally, in society. For example, some mentally retarded people can obtain driver’s licenses, handle money, and live alone.
On rebuttal, Dr. Doug McKeown, a clinical and forensic psychologist, testified that he had reviewed the appellant’s school records, previous evaluations, and various other relevant records. Based on that review, he concluded that some of the appellant’s scores showed that his actual adaptive function and ability level were beyond what the IQ test showed; that the appellant was probably in the borderline range of intellectual functioning; and that, at the time of the offense, the appellant was not functioning at the level of mental retardation.
On cross-examination, McKeown admitted that, with regard to home living, records showed that the appellant’s family was somewhat dysfunctional. He also admitted that the appellant had a deficit in his functional academic skills.
Finally, in its sentencing order, the trial court found that the appellant was “borderline mentally retarded” and “mildly mentally retarded.” (C.R. 605, 607.) With regard to whether the appellant had the capacity to appreciate the criminality of his conduct or to conform his conduct to *235 the requirements of law, it also found, in part, as follows:
“The evidence presented by the Defense basically showed matters that had happened to the Appellant and Appellant’s family members that could possibly affect his dysfunction as an adult. The following evidence was presented during the sentencing on this mitigating circumstance:
[[Image here]]
“(3) That the Appellant’s home environment was not healthy. His grandmother raised him because of this parent’s alcohol problems. The Appellant was abused and molested by an older cousin when he was twelve years of age. That the Appellant’s older brother was also molested. That the Appellant’s sister became pregnant at the age of thirteen. The Appellant witnessed physical altercations between his parents. The Appellant and his siblings started abusing drugs and alcohol when he was eight years old. At the age of eighteen, the Appellant lived with his sister who was abusing drugs and alcohol.
“(4) The evidence shows that the Appellant had a brother with a serious mental illness and a sister who was mentally retarded. The Appellant’s older brother was also mentally retarded and took psychotropic medication and had been diagnosed as a schizophrenic. Both siblings had been incarcerated.
“Other evidence provided on this issue were the following:
“(1) The Defendant’s use or misuse or abuse of drugs was a result of his mental or emotional disturbance.
[[Image here]]
“(5) Jerry Jerome Smith has the learning capacity of a third grader.
[[Image here]]
“(11) Mr. Smith was in special education classes all of his life; only finished the eighth grade.
[[Image here]]
“(13) Mr. Smith cannot read or write.
“(14) The Defendant’s low IQ and his low frustration tolerance and poor impulse control.
“(15) The dysfunction of his childhood home.
“(16) The fact that he acted as a 12 year old with regard to the capacity to form the intent to commit the crime. The Court has considered all of the factors listed on whether there existed the statutory mitigating circumstance under § 13A-5-51(6). The Court finds that it does exist.”
(C.R. 603-06.) The trial court also found that the following relevant non-statutory mitigating circumstances existed:
“6. Jerry Jerome Smith has the learning capacity of a third grader.
[[Image here]]
“10. Darren Smith (brother) is mentally retarded....
[[Image here]]
“16. Jerry Jerome Smith was in special education classes all of his life and only finished the eighth grade. Even so, he was illiterate when he finished school.

a

“18. Jerry Jerome Smith cannot read or write.
“19. Jerry Jerome Smith’s brother, Arlester, is mentally retarded.

U

*236 “22. Jerry Jerome Smith’s cousin, Annie Jewel Turner, is in a mental institution.”
(G.R. 607-09.)
The record before us, which was more fully developed on remand following Atkins, affirmatively establishes that, well before age eighteen, the appellant had significantly subaverage intellectual functioning. Specifically, as early as age eight, his IQ score was 61. There is also an indication that the appellant’s IQ at age twelve was 66. From an early age, the appellant performed poorly in school. As a result, he was classified as educably mentally retarded and was placed in special education classes. Finally, subsequent Stanford Achievement Test scores showed that he was below average in the majority of the areas tested.
When it conducted its plain error review of this issue based on the record before it, the Alabama Supreme Court did not have the benefit of information about the appellant’s IQ scores and adaptive skills before the age of eighteen. In fact, it specifically noted that, based on the record before it at that time, it did not need to address the matter of whether the appellant’s problems manifested themselves before the age of eighteen. Likewise, D’Errico did not have such information when he first concluded that the appellant was mildly mentally deficient. However, he explained that the additional information about the appellant’s IQ scores and adaptive skills before the age of eighteen caused him to change his initial opinion and conclude that the appellant was indeed mildly mentally retarded.
In addition, the record affirmatively establishes that the appellant had significant or substantial deficits in adaptive behavior before the age of eighteen. He clearly had significant or substantial deficits in functional academics. Also, the testimony of various witnesses who knew the appellant during his developmental period establishes that, at the very least, he had substantial deficits in self-care, home living, and social skills. In fact, even the State’s expert, Dr. McKeown, conceded that the appellant had deficits in home living and functional academics.
For these reasons, we conclude that the appellant is mentally retarded and is therefore not eligible for the death penalty. In reaching this conclusion, we find Dr. D’Errieo’s testimony and change of opinion during the new sentencing proceeding to be compelling. We also find the trial court’s findings that the appellant was borderline mentally retarded and mildly mentally retarded and its findings about his deficits in adaptive behavior to be significant and entitled to great weight.
We recognize that, upon a cursory review, it appears that we are second-guessing a decision the Alabama Supreme Court has already made. However, as set forth above, we believe that the Alabama Supreme Court simply intended for its previous opinion to be a threshold determination, based on the scant record before it at the time, as to whether a remand for a new sentencing proceeding was necessary. We also find authority for our decision in the Alabama Supreme Court’s statement that “a death sentence may be imposed in this case if such a sentence is deemed proper after the new penalty-phase proceeding.” Ex parte Smith, 213 So.3d at 226.
For the above-stated reasons, we reverse the trial court’s judgment as to sentence and remand this ease with instructions that the trial court set aside the appellant’s sentence of death and resen-tence him to imprisonment for life without *237 the possibility of parole.[1]
REVERSED AND REMANDED.
McMILLAN, P.J., and COBB, and WISE, JJ., concur; SHAW, J.,* dissents, with opinion.

. The Supreme Court issued its certificate of judgment on June 11, 2003.

. Because of our disposition of this issue, we need not address the remaining arguments the appellant raises in his brief to this court.

 Note from the reporter of decisions: On the prior actions in this case, Judge Shaw ra-cused himself. When the case was resubmitted on return to remand in 2005, the reason for Judge Shaw’s recusal had been removed, and he sat in consideration of the case.