BASCHAB, Presiding Judge,
dissenting.
For the reasons set forth in this court’s opinion on return to third remand, see Smith v. State, 213 So.3d 226, 228 (Ala.2006) (opinion on return to third remand), and for the additional reasons set forth in this dissent, I adhere to my belief that the appellant is mentally retarded and therefore not eligible for the death penalty. Therefore, I respectfully dissent.
During the hearing on remand, the parties incorporated all of the evidence and testimony from the previous proceedings related to this case. That information is covered extensively in the previous opinions regarding this case.
In addition, the defense called Dr. John Goff, a clinical psychologist and neuropsy-chologist. Goff testified that he evaluated the appellant; that he met with the appellant on two occasions; that he reviewed school records, DHR records, court records, and evaluations; and that he interviewed approximately six family members and administered a formal adaptive skills assessment to two of them. Based on his review and testing, he concluded that, whatever definition of mental retardation is used, the appellant satisfies the criteria to be classified as mentally retarded.
Goff testified that he administered the Wechsler Abbreviated Scale of Intelligence to the appellant; that he would have preferred to use the Wechsler Adult Intelligence Scale because it is longer and more *307 reliable, but Dr. Harry McClaren, the State’s expert, had recently administered that test to him; and that administering the same intellectual assessment repeatedly within a short period of time can lead to erroneous results. The results showed that the appellant had a verbal IQ of 69, a performance IQ of 72, and a full scale IQ of 67. Goff testified that the results were consistent with and closely correlated with other intelligence test results through the years, including those McClaren obtained. He also testified that he used two techniques that indicated that the appellant was not malingering.
With regard to adaptive skills, Goff testified that the definition of mental retardation turns on what a person cannot do, or deficits, rather than on what he can do, and that the person must show deficits in two areas to be considered mentally retarded. He also testified that a person who is mildly mentally retarded may be able to do things other people can do, but may do them at a lower level, and that abilities vary from person to person. When he was asked about the relevance of things a person can do, Goff testified as follows:
“Well, there may be some things—I’m sure there are some things that if someone can do them, it would strongly suggest that someone is not mentally retarded. If someone can get a graduate degree at Auburn or the University of Alabama, it would suggest that they are not mentally retarded. But in terms of daily activities, the things that are covered by the adaptive skills assessment, things like self-care skills, self-help skills, things like that, if they can do a number of those things, that doesn’t mean they are not mentally retarded.”
(R. 40-41.) He also testified that “you can’t do an adaptive skills assessment because of an individual act or skill or behavior.” (R. 42.) On redirect examination, Goff further explained his reasoning during the following exchange:
“[THE APPELLANT’S COUNSEL]: Just to be clear, Dr. Goff, when you assess adaptive behavior, do you ignore things that he can do?
“[GOFF]: No. Just the fact that someone can do a particular thing does not mean he’s not mentally retarded. And that is the problem.
“[THE APPELLANT’S COUNSEL]: Why is that?
“[GOFF]: Well, because that is just one thing. And we could make a long list of things that people can do—that any individual can do. Mentally retarded people can shoot baskets, and they can perhaps do this or do that or drive a car or run a chain saw successfully or unsuccessfully. But that does not go to, particularly, in my view, at least, whether he meets the diagnostic criteria for the condition. That is what we are supposed to be looking at, I think.”
(R. 97-98.)
Goff testified that he assessed the appellant’s adaptive skills through interviews with people who knew the appellant well and through a test administered to the appellant. The test he administered to the appellant, which assessed functional academics, indicated that the appellant could not read or spell and that his mathematics skills were on a second grade level. Goff testified that the appellant’s inability to read and write overlapped with and could also affect other adaptive skills, including communication, health and safety, and community use. Based on his testing, he found that the appellant demonstrated substantial deficits in essentially all of the adaptive skills areas and that he had deficits more than two standard deviations below the mean in four areas—functional academics, community use, health and *308 safety, and leisure. Goff further testified that he did not account for “street smarts” in his assessment of the appellant’s adaptive skills because
“there is not any formal scientific definition for street smarts. In order to adopt such a definition or utilize such a definition, you’d have to have a definition for street stupid, I guess. And as far as I know, there is no such thing. I know what people are trying to refer to in that regard. But it does not have any bearing on a definition or a classification as being mentally retarded.”
(R. 58-59.) Finally, on cross-examination, he stated that he did not agree that the appellant’s adaptive functioning was actually higher than what he would expect for a mentally retarded person.
Goff further testified that, based on the testimony of family, friends, and teachers, including IQ and academic achievement scores, the appellant clearly exhibited developmental difficulties before the age of eighteen. -
Goff testified that the appellant appeared to have a family history of mental retardation; that mental retardation tends to run in families; and that environmental factors can predispose a person to be mentally retarded. He also testified that it is not inconsistent with being mentally retarded for a person to be evasive or to have a wife and children. With regard to the appellant’s alleged drug enterprise, Goff testified that the appellant told him he went to Florida only two times. He also testified that the appellant admitted that he frequently got other people to fill out various forms of paperwork for him.
During the hearing on remand, the State called Dr. Harry McClaren, a forensic psychologist. McClaren testified that he evaluated the appellant; that he met with the appellant on three occasions; and that he reviewed prison records, investigation reports, and testimony from previous court proceedings and spoke with the appellant, prison employees, detectives, a teacher, and family members. Based on his review and testing, he concluded that the appellant is not mentally retarded.
McClaren testified that he administered the Wechsler Adult Intelligence Scale, Third Edition to the appellant. The results showed that the appellant had a verbal IQ of 73, a performance IQ of 68, and a full scale IQ of 68. He also testified that he did not see indications that the appellant was malingering, although he may have been depressed or in shock at being returned to death row when he took the various tests.
With regard to adaptive skills, McClaren testified that he administered an evaluation tool to a correctional officer who had had contact with the appellant while he was incarcerated at Holman Prison. He admitted that some of the appellant’s behaviors were limited by the prison setting, but stated that he thought that would be the best indicator as to how the appellant is presently doing. McClaren testified that that evaluation tool indicated that the appellant had an IQ in the 80s, which is above the level for mental retardation.
McClaren testified that the appellant discussed his work history, his prior criminal record, how he got involved in selling drugs, and how he bought a diamond cluster ring from a pawn shop. He also testified that the appellant discussed medical conditions using medical terminology, that he had a bank account and apparently made regular deposits into the account, and that he was able to drive. Based on his testing and observations, McClaren testified that, with regal’d to adaptive skills, he thought the appellant was in the borderline or high borderline range. He also stated that it appeared that his *309 adaptive skills had improved significantly from what they were before he was eighteen years old.
McClaren testified that mental retardation is not a lifelong condition and that a person’s adaptive skills can improve so that a diagnosis of mental retardation is no longer appropriate. Finally, he explained why he concluded that the appellant was not mentally retarded during the following:
“[MCCLAREN]: I can tell you what I think. No doubt, that he had some IQ scores, in fact, all the IQ scores that I know in the school records that indicate school scores measured IQ that would be indicative of mild, mental retardation, if they were not spirally lowered by things such as exposure to domestic violence, poverty, cultural deprivation, ethnicity, perhaps intoxication. He told me that he was accustomed to late elementary, early middle school years to take ... a half pint of gin to school and do that at recess. I can’t help to think that would have an adverse affect, if that was true, on his measured IQs, especially later on. Also, it was clear from talking to his brother, Jimmy, and directly observing one of his half brothers that he had been exposed to domestic violence of a serious nature as a young child, that he had a family history of depression, and had made suicide attempts in his life eating rat poison, attempted another time Jimmy told me—I had not heard of—-he may have wanted to kill himself with exhaust fumes and also huffing gas.
“[PROSECUTOR]: Just to wrap this up, is it possible that those things, like substance abuse, huffing gas, the other things you mentioned affect cognitive functioning such that the IQ becomes lower not because of retardation but because of these external influences?
“[MCCLAREN]: Of course.”
(R. 144-46.)
In Atkins v. Virginia, 536 U.S. 304, 321, 122 S.Ct. 2242, 2252, 153 L.Ed.2d 335 (2002), the United States Supreme Court held:
“We are not persuaded that the execution of mentally retarded criminals will measurably advance the deterrent or the retributive purpose of the death penalty. Construing and applying the Eighth Amendment in the light of our ‘evolving standards of decency,’ we therefore conclude that such punishment is excessive and that the Constitution ‘places a substantive restriction on the State’s power to take the life’ of a mentally retarded offender. Ford [v. Wainwright], 477 U.S. [399,] 405 [(1986)].”
In Atkins, the Supreme Court noted:
“The American Association on Mental Retardation (AAMR) defined mental retardation as follows: ‘Mental retardation refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community .use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18.’ Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th ed. 1991).
“The American Psychiatric Association’s definition is similar: ‘The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A), that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: com *310 munication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological' processes that affect the functioning of the central nervous system.’ Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed.2000). ‘Mild’ mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70. Id. at 42-43.”
536 U.S. at 308 n. 3, 122 S.Ct. at 2245 n. 3. The Supreme Court also stated:
“[C]linical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18. Mentally retarded persons frequently' know the difference between right and wrong and are competent to stand trial. Because of them impairments, however, by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reaction of others. There is no evidence that they are more likely to engage in criminal conduct than others, but there is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders. Their deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability.”
536 U.S. at 318, 122 S.Ct. at 2250-51 (footnotes omitted). Finally, the Supreme Court stated:
“ ‘[W]e leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.’ [Ford v. Wainwright, 477 U.S. 399,] 405, 416-17 [ (1986) ].”
536 U.S. at 317, 122 S.Ct. at 2250.
Our Legislature has not established a method for deciding whether a capital defendant is mentally retarded as contemplated by Atkins and therefore not eligible for the death penalty. At most, Alabama has the “Retarded Defendant Act,” § 15-24-1 et seq., Ala.Code 1975. Section 15-24-2(3), Ala.Code 1975, defines a mentally retarded person, for purposes of the Act, as “[a] person with significant subaverage general intellectual functioning resulting in or associated with concurrent impairments in adaptive behavior and manifested during the developmental period, as measured by appropriate standardized testing instruments.” Finally, in Ex parte Perkins, 851 So.2d 453, 456 (Ala.2002), the Alabama Supreme Court held:
“[A] defendant, to be considered mentally retarded, must have significantly sub-average intellectual functioning (an IQ of 70 or below), and significant or substantial deficits in adaptive behavior. Additionally, these problems must have manifested themselves during the developmental period (i.e., before the defendant reached age 18).”
With regard to the appellant’s intellectual functioning, testing by Goff showed that his IQ was 67, and testing by McClaren showed that his IQ was 68. Those scores were consistent with and correlated closely with previous IQ scores throughout his childhood and adulthood. Therefore, under the definition set forth in Ex parte Perkins, the appellant’s intellectual func *311 tioning before the age of eighteen, at the time of the' offense, and currently would be considered substantially subaverage.
With regard to adaptive behavior, the record affirmatively establishes that the appellant had significant or substantial deficits in adaptive behavior before the age of eighteen. He clearly had significant or substantial deficits in functional academics. Also, the testimony of various witnesses who knew the appellant during his developmental period establishes that, at the very least, he had substantial deficits in self-care, home living, and social skills. In fact, even Dr. McKeown conceded that the appellant had deficits in home living and functional academics.
The record also affirmatively establishes that the appellant had significant or substantial deficits in adaptive behavior at the time of the offense and at the time of Goff’s and McClaren’s evaluations. Both Goff and McClaren appeared to agree that the appellant had deficits in functional academics. Goff also found that the appellant demonstrated substantial deficits in community use, health and safety, and leisure.
To support its finding that the appellant was not mentally retarded, the trial court relied on McKeown’s and McClaren’s testimony about his social adaptive functioning and his ability to function in society. Rather than assess the appellant in terms of areas in which he demonstrated significant or substantial deficits in adaptive behavior, they concentrated on what the appellant was able to do.[16] However, the various definitions of mental retardation that are set forth in Atkins are couched in terms of limitations in at least two areas of adaptive skills or functioning. As Goff explained, the definition of mental retardation turns on what a person cannot do, or deficits, rather than on what he can do. He further explained that “you can’t do an adaptive skills assessment because of an individual act or skill or behavior” and that a person may be able to conduct a number of daily activities and still be considered mentally retarded. (R. 42.) Goff also testified that, when attempting to determine whether a person is mentally retarded, it is best to meet with that person. However, it does not appear that McKeown actually met with the appellant. Finally, McClaren relied on information from a correctional officer to assess the appellant’s adaptive skills. However, Goff specifically testified that he did not think it would be helpful to assess the appellant’s adaptive behavior while he was in prison because many of the areas simply are not available in prison life, and McClaren even admitted that some of the appellant’s behaviors were limited by the prison setting. Thus, the trial court’s reliance on McKeown’s and McClaren’s testimony about the appellant’s adaptive behavior is misplaced. Rather than focusing on what the appellant was able to do, the trial court should have focused on the deficits in the appellant’s adaptive behavior and concluded that he continued to exhibit significant or substantial deficits in adaptive behavior at the time of the offense and at the time of Goffs and McClaren’s evaluations.
Also, the trial court did not explain that it believed one expert over another or did not credit D’Errico, who changed his opinion. Instead, it apparently discounted the appellant’s low IQ scores, and particularly those measured when he was a child, based on McClaren’s testimony that they were “spuriously lowered by things such as exposure to domestic violence, poverty, cultural deprivation, ethnicity, perhaps in *312 toxication.” However, such influences could legitimately have a negative effect on a child’s IQ, and early IQ scores that may have been affected by such influences should not be discounted. As the United States Supreme Court noted in Atkins, the American Psychiatric Association has recognized that “‘[m]ental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system.’ Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed. 2000).” 536 U.S. at 308 n. 3, 122 S.Ct. at 2245 n. 3. Thus, the trial court improperly focused on external influences and improperly refused to consider early childhood manifestations that the appellant was mentally retarded.
Finally, I feel compelled to point out that, in its previous opinions in this case, the Alabama Supreme Court has, in essence, made detailed findings of fact and gone to great lengths to explain why it does not believe the appellant is mentally retarded. Subsequently, the prosecutor, the trial court, the State’s mental health experts, and the attorney general have parroted those findings in arguing or concluding that the appellant is not mentally retarded. However, as Justice Lyons specifically noted in his special concurrence in the supreme court’s most recent opinion in this case, “Any discussion by this Court of issues that should never have been addressed by the Court of Criminal Appeals is dicta.” Smith v. State, 213 So.3d at 255. Therefore, this court is not bound by any such findings.
In addition, I would note that, in its most recent opinion in this case, the Alabama Supreme Court appears to have added requirements that a defendant exhibit subaverage intellectual functioning and significant defects in adaptive behavior at the time the crime was committed and also currently. See Smith v. State, 213 So.3d at 248. It relies heavily on its. own caselaw to support such conclusions. However, when Alabama appellate courts first addressed claims about mental retardation after the decision in Atkins was released, they focused on the fact that most of the petitioners had not established that the problems had manifested themselves before the petitioners were 18 years of age. Now that some petitioners are showing that such problems manifested themselves before the petitioners were 18 years old, the focus appears to have shifted to the petitioner’s abilities at the time of the offense and at the present time. Based on my reading of Atkins and previous Alabama caselaw, I do not believe that such a shift, or addition of requirements, is warranted.
The key to determining whether a defendant is truly mentally retarded for purposes of Atkins is assessing whether he manifested or exhibited subaverage intellectual functioning and significant defects in adaptive behavior before the age of eighteen. Unlike an adult who has been charged with a capital offense and faces capital punishment, a child who is being assessed for educational purposes has little, if any, incentive to feign mental retardation. Thus, focusing on a defendant’s intellectual and adaptive functioning before the age of eighteen would be less arbitrary than trying to make an assessment as of the time of the offense or subsequent to the offense and should, in most cases, avoid false claims of mental retardation by people who have subsequently lowered their IQs, whether intentionally or not.
For the above-stated reasons, and contrary to the’trial court’s findings, the record before this court affirmatively establishes that the appellant has significantly subaverage intellectual functioning and significant deficits in adaptive behavior. It *313 also affirmatively establishes that these problems manifested themselves before the appellant reached the age of eighteen, that they existed at the time of the offense, and that they existed at the time of the evaluations by Goff and McClaren. Therefore, this court should conclude that the appellant is mentally retarded and is therefore not eligible for the death penalty. Accordingly, I respectfully dissent.

. In its previous opinions regarding this case, the Alabama Supreme Court also concentrated on what the appellant was able to do rather than addressing areas in which he demonstrated significant or substantial deficits in adaptive behavior.