789 So.2d 888 (2000)
Ex parte Stephen PILLEY.
(In re Stephen Pilley v. State).
1980132.
Supreme Court of Alabama.
January 28, 2000.[*]
Opinion on Overruling of Rehearing June 16, 2000.
*889 Joe W. Morgan, Jr., Birmingham, for petitioner.
Bill Pryor, atty. gen., and Michelle Riley Stephens, asst. atty. gen., for respondent.
LYONS, Justice.
Stephen Pilley was convicted of capital murder, based on the murders of five persons committed pursuant to one scheme or course of conduct. See § 13A-5-40(a)(10), *890 Ala.Code 1975. The jury recommended, by a 12-0 vote, that Pilley be sentenced to death by electrocution. The trial court concurred with that recommendation and sentenced Pilley to death.
The Court of Criminal Appeals affirmed Pilley's conviction and sentence. See Pilley v. State, 789 So.2d 870 (Ala.Crim.App. 1998). This Court granted Pilley's petition for certiorari review, and we now reverse and remand.
The Court of Criminal Appeals stated the following facts:
"On the morning of October 16, 1994, the bodies of Lester Edward Dodd, Pamela Dodd, William A. Nelson, Sr., James Watkins, and Florence Adell Elliott were found in the Changing Times Lounge, a neighborhood bar, in Birmingham. The Dodds, who worked at the bar, were found lying facedown in the pool-table area of the lounge, while the other three, who were regular bar patrons, were found lying facedown in the bar area. The positions of the bodies suggested an `execution style' killing. All five died from gunshot wounds to the top or back of the head inflicted by two distinctive types of handgun ammunition:.25 caliber CTI Blazer bullets and 9mm Glazer bullets. A forensic expert testified that, while no guns were ever recovered, he was certain that two weapons had been used in these murders. The bar had been ransacked, the cash register emptied, and the personal effects of the victims scattered around the bar.
"A bartender at the Crazy Eights Bar in Bessemer testified that, around 7:00 p.m. on October 15, 1994, while working in the bar, he overheard Pilley and Andrew Apicella discussing a way to make some `easy money.' The bartender testified that he heard Pilley tell Apicella that he did not have a gun, and Apicella responded by telling him he could get guns. Shortly after this conversation, Pilley and Apicella left the Crazy Eights Bar.
"Five customers who had been at the Changing Times Lounge at various times the night of October 15, 1994, identified Pilley as having been in the bar that night with another male. These witnesses remembered Pilley and his friend because they were not regular customers and because Pilley would yell at persons putting money in the jukebox to play country music. While Pilley's friend was playing pool, Pilley would wander about the bar. The last of these witnesses to leave the bar testified that when he left at between 11:30 p.m. and midnight, Pilley and his friend were still in the bar with about five other customers and the Dodds.
"Rhonda Haynes, a friend of Pilley's, testified that, after she had gone to bed on the night of October 15, 1994, Pilley and Andrew Apicella came to her house unannounced, and asked her to arrange for a motel room where they could spend the night. They stayed with her until daybreak, injecting each other with a cocaine solution. During that stay, Haynes helped the two men count and divide money they claimed to have won at a bar playing pool, amounting to $150 for each man. From this money, Pilley handed Haynes five $2 bills, asking her to hold them for him.
"The former testimony of Pamela Haddix was read into evidence, indicating that Ms. Haddix had lived with one of the victims, William A. Nelson, Sr. According to Ms. Haddix's testimony, it was their custom to save $2 bills to give to their grandchildren as gifts. Ms. Haddix testified that, at the time of his *891 death, Mr. Nelson had five $2 bills folded in a `secret pocket' in his wallet.
"A lawyer, retained by the Apicella family on an unrelated matter, turned over to police jewelry that was subsequently identified as belonging to Pamela Dodd."
789 So.2d 874-75.
In his brief, Pilley presents 14 issues for our review; however, we will address only two of them. We conclude that the trial court erred in refusing to declare a mistrial after learning that a deputy district attorney had contacted a juror after the jury had been selected but before the trial had begun; that juror ultimately served as the foreman of the jury that convicted Pilley and recommended the imposition of the death penalty. That error requires a reversal. We also find it appropriate, however, to address Pilley's argument regarding the sufficiency of the evidence, because the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution would bar a retrial if Pilley is correct in arguing that the evidence was insufficient to establish his guilt. Burks v. United States, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); see, also, Ex parte Roberts, 662 So.2d 229 (Ala.1995).

I. Juror Contact
Pilley argues that the trial court erred in denying his motion for a mistrial because of telephone contact between a deputy district attorney and a member of the jury. Alternatively, Pilley argues that the trial court erred in refusing to put an alternate juror in place of the juror who had had the contact with the deputy district attorney.
Before trial, Deputy District Attorney Jeff Wallace ("the prosecutor") received a list containing the names of all the citizens summoned for jury service during the week of Pilley's trial. From that jury venire, 12 regular jurors and 2 alternate jurors were selected to try the State's case against Pilley. After that jury had been selected, Lane Tolbert, who is a deputy district attorney in the prosecutor's office but who did not work on Pilley's case, recognized a name on the jury venire list. He notified the prosecutor that one of the jurors selected in Pilley's case might be a person with whom he attended church. The prosecutor then asked Tolbert to look at the jurors through a window in the door of the courtroom to determine whether the juror was the man he knew from church. Tolbert did not do as the prosecutor asked; instead, Tolbert telephoned the juror's residence and spoke with his wife, whom he apparently also knew from church. According to the record, Tolbert confirmed during this conversation that the juror was indeed the man with whom he attended church. The man had been selected as a regular juror in the Pilley case.
Although the trial court had admonished all jurors that they were to call to the court's attention any contacts they might receive concerning the case, this juror did not follow the court's instruction. Instead, on the following day, the juror telephoned Tolbert and asked him why he had telephoned his wife. Tolbert said that during the ensuing conversation he asked the juror whether their contact would affect his ability to decide the case. After the juror assured Tolbert that he would not be affected by the telephone call, Tolbert said that he advised the juror that he need not disclose their conversation unless he was asked about it. There is no transcript of the conversations between Tolbert and the juror and between Tolbert and the juror's wife; therefore, we cannot state with certainty the entire content of these conversations.
The prosecutor learned of the contact between Tolbert and the juror; the prosecutor learned of it on the second day of the *892 trial, after the jury had been sworn and before the lawyers gave their opening statements. The prosecutor then advised the trial court about the two telephone calls. There is no indication in the record that the prosecutor learned about the telephone calls from the juror. When asked by the trial court what took place in his conversation with the juror, Tolbert stated:
"MR. TOLBERT: Actually, it was a return of a call to his wife. I had called yesterday. I did not ask him to call me by any means. He called me and said called me and said jokingly, `Why did you call my wife?' I said just because she was at home. He then said something, `I didn't realize where you worked.' I said, `That's all right unless they ask you.' He said, `Well, they did ask me but I wasn't sure exactly what you did.' I said, `All right. Is that going to affect your decision in any way?' I was trying to minimize this as much as I could. He said, `No.' I said, `Okay. Well, that's about it.' And I told him I would avoid him until after this is over with."
At that point, Pilley moved for a mistrial, but the trial court deferred ruling on Pilley's motion until after the court had talked with the juror.
The record then reflects a colloquy between the juror and the trial court during which the juror told the trial court that his contact with Tolbert would not affect his ability to be an impartial juror. As that colloquy continued, the juror described to the court his unfamiliarity with Tolbert's position:
"THE COURT: Mr. W., if you would, just have a seat just a minute. As I understand, Mr. Tolbert knows you from church; is that correct?
"MR. W.: He goes to my
"THE COURT: As I understand, y'all had a conversation. Can you tell me what all took place in the conversation that you had with Mr. Tolbert last night?
"MR. W.: I called Lane [Tolbert]. He had called my house and told my wife that he had seen me on the list. Said that was about it. I had called him and he had asked me what was going on. I said that we couldn't talk about it. I didn't even mention the fact that I knew him because I didn't know what he did.
"THE COURT: Uh-huh. Okay.
"MR. W.: He said, `Well, that's all right. Just, you know, don't, you know, let anything be changed or don't do anything because you know me.'
"THE COURT: Do you remember any other part of the conversation?
"MR. W.: Well, no, sir. I really don't other than the fact that he called my house."
The trial court then cautioned the juror not to talk to the other jurors about his knowing Tolbert, and the juror replied:
"MR. W.: Yes, sir. Well, I was wondering about that. And I didn't know and I kind of felt bad, but, like I said, I don't know what Lane does.
"THE COURT: At the time of jury organization, you did not know what his position was?
"MR. W.: I still don't know what his position is."
There are two possible interpretations of the extent of the juror's knowledge about Tolbert's employment. Under one interpretation, the juror was ignorant of any relationship between Tolbert and the district attorney's office. Under another interpretation, the juror was aware that Tolbert had some relationship with the office but did not know his precise title or function within that office.
*893 The trial court denied Pilley's motion for a mistrial. Pilley then asked the court to discharge the juror and replace him with one of the two alternate jurors. The court deferred until the conclusion of the trial its ruling on Pilley's request that the juror be replaced by an alternate, but it ultimately denied that request. The trial went forward, and the jury found Pilley guilty and unanimously recommended the death penalty. The juror who had talked with Tolbert served as the foreman of the jury.
The Court of Criminal Appeals concluded that, under the circumstances of this case, and given the trial court's questioning of both the juror and Tolbert, the trial court did not abuse its discretion in denying Pilley's motion for a mistrial and allowing the juror to serve. Central to the Court of Criminal Appeals' rationale was the assumption that the juror was ignorant of any relationship between Tolbert and the district attorney's office.
The appropriate standard for evaluating improper contacts with a juror is stated in Roan v. State, 225 Ala. 428, 143 So. 454 (1932), where the test is articulated in terms of whether the contacts might have had a prejudicial effect on the juror:
"The test of vitiating influence is not that it did influence a member of the jury to act without the evidence, but that it might have unlawfully influenced that juror and others with whom he deliberated, and might have unlawfully influenced its verdict rendered."
225 Ala. at 435, 143 So. at 460 (emphasis added). This standard casts a light burden on the defendant, especially here, where we are not reviewing for "plain error," but are reviewing rulings made by the court after defense counsel had made appropriate objections. We deem it equally plausible, if not more plausible, that the juror's ignorance of his fellow church member's employment involved ignorance only of Tolbert's function in the district attorney's office, and not the broader ignorance of any relationship with that office whatever. We conclude that the Roan standard for determining prejudice has been satisfied. Had the juror, during voir dire examination, stated that he attended church with Tolbert, that information would have given Pilley a ground to challenge him for cause or a reason to exercise a peremptory challenge to remove him from the jury. Knop v. McCain, 561 So.2d 229 (Ala.1989); England v. State, 601 So.2d 1108 (Ala.Crim.App.1992).
This murder trial was not anticipated to last for an inordinately long time. The presence of alternate jurors is hard to justify if the circumstances here presented did not warrant discharging the regular juror who had contact with Tolbert and seating an alternate juror in his place. If this were a civil case with a substantial punitive-damages award, we would be deeply troubled by evidence of similar conduct by the partner of a plaintiff's attorney who was not himself involved in the trial of the case. Here, where the penalty is the maximum inflicted by law, death, we find such contact with a prospective juror by a member of the district attorney's office intolerable. Given the circumstances of this case, we must conclude that Pilley is entitled to a new trial.

II. Sufficiency of the Evidence
Pilley argues that the evidence presented by the State was insufficient to convict him. He insists that the State did not prove that he committed the crimes of which he was accused and convicted. Specifically, Pilley argues that the State's circumstantial evidence was not sufficient to prove that he had the intent to kill and that there was no evidence of his complicity in the robberies and murders.
*894 In Ex parte Woodall, 730 So.2d 652 (Ala.1998), this Court addressed the role of appellate courts in reviewing the sufficiency of the evidence in a criminal case:
"`In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution. Faircloth v. State, 471 So.2d 485 (Ala.Cr. App.1984), aff'd, 471 So.2d 493 (Ala. 1985).' Powe v. State, 597 So.2d 721, 724 (Ala.1991). It is not the function of this Court to decide whether the evidence is believable beyond a reasonable doubt, Pennington v. State, 421 So.2d 1361 (Ala.Cr.App.1982); rather, the function of this Court is to determine whether there is legal evidence from which a rational finder of fact could have, by fair inference, found the defendant guilty beyond a reasonable doubt. Davis v. State, 598 So.2d 1054 (Ala.Cr. App.1992). Thus, `[t]he role of appellate courts is not to say what the facts are. [Their role] is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury.' Ex parte Bankston, 358 So.2d 1040, 1042 (Ala.1978) (emphasis original)."
730 So.2d at 658.
The Court of Criminal Appeals addressed the question of the sufficiency of the evidence against Pilley:
"The evidence before the jury indicated that Pilley had been in the Changing Times Lounge previously, and that he knew the layout of the bar. (R. 364.) There was testimony that the night of the murders he had been overheard discussing obtaining weapons and `easy money.' (R. 379.) Witnesses saw him and Andrew Apicella in the Changing Times Lounge late on the night of the murders. Witnesses described him as acting nervous during the evening. At one time, he asked a bar patron if Edward Dodd owned the bar and whether Dodd was carrying a gun. (R. 441.) Evidence indicated that two weapons were used in the murders; the position of the bodies of the victims when found indicated the five victims had been separated the Dodds were killed in the pool-table area of the bar, and the three customers were killed on the other side of the establishment. That the victims appeared to have been laid on their faces with their heads in their hands before being shot in the head indicates that they had been deliberately `executed' by their killers. Later that evening, Pilley and Apicella split approximately $300, including five $2 bills, similar to the bills that one of the murder victims had kept in his wallet. (R. 521.) Later, the Apicella family's lawyer turned over to the police jewelry belonging to Pamela Dodd.
"Accepting as true all the evidence introduced by the State, and according the State all legitimate inferences therefrom, and viewing the evidence in the light most favorable to the prosecution, we conclude there was sufficient evidence from which the jury could have found Pilley either was directly responsible for the murders or was an accomplice, and that he possessed the requisite specific intent to kill. The evidence is sufficient to sustain the jury's finding of guilty as to the capital murder charge. Carden v. State, 621 So.2d 342, 347 (Ala.Cr.App.1992)."
789 So.2d 877.
After reviewing the record in this case, we agree with the Court of Criminal Appeals that the State presented sufficient *895 evidence from which the jury could have found that Pilley either committed the murders or was an accomplice in those murders, and that he had possessed the requisite intent to kill. We conclude that the evidence was sufficient to sustain Pilley's conviction, and, therefore, that double-jeopardy principles do not bar a retrial.

III. Conclusion
We reverse the judgment of the Court of Criminal Appeals and remand the cause for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
MADDOX, HOUSTON, COOK,[**] SEE, and JOHNSTONE, JJ., concur.
BROWN, J., recuses herself.[***]

On Application for Rehearing
LYONS, Justice.
The State argues that this Court should apply the standard for evaluating unprovoked juror misconduct, as stated in Dawson v. State, 710 So.2d 472 (Ala. 1997), instead of the standard for evaluating improper contacts by a deputy district attorney with a juror, as stated in Roan v. State, 225 Ala. 428, 143 So. 454 (1932). We disagree. In Dawson, a juror had conducted an unauthorized inspection of the crime scene. In this case, we are presented not only with the juror's act of telephoning Tolbert instead of reporting the conduct to the court, but also with Tolbert's acts in initiating the contact with the juror's wife and in talking with the juror when he telephoned, a situation not presented in Dawson.
APPLICATION OVERRULED.
HOOPER, C.J., and MADDOX, HOUSTON, COOK, SEE, and JOHNSTONE, JJ., concur.
BROWN, J., recuses herself.[]
NOTES
[*] Note from the reporter of decisions: This opinion was released by the Supreme Court under the date January 28, 2000. The case was actually released to the public on January 27, 2000.
[**] Although Justice Cook did not sit for oral argument, he has listened to the tape of oral argument.
[***] Justice Brown was a member of the Court of Criminal Appeals when that court considered this case.
[] Justice Brown was a member of the Court of Criminal Appeals when that court considered this case.