LYONS, Justice.
Jerry Jerome Smith was convicted in February 1998 of capital murder in the deaths of Willie Flournoy, Theresa Helms, and David Bennett. The murders were made capital because they were committed by one act or pursuant to one scheme or course of conduct. See § 13A-5-40(a)(10), Ala.Code 1975. The jury recommended by a vote of 11-1 that Smith be sentenced to death. The trial court followed the jury’s recommendation and sentenced Smith to death. On appeal, the Court of Criminal Appeals affirmed Smith’s conviction, but remanded the case for the trial court to correct the sentencing order. Smith v. State, 213 So.3d 108 (Ala.Crim.App.2000) (“Smith I ”). After remanding the case a second time for correction of the sentencing order, the Court of Criminal Appeals affirmed Smith’s death sentence. Smith v. State, 213 So.3d 108, 209 (Ala.Crim.App.2000) (opinion on return to second remand) (“Smith II”). This Court affirmed the judgment of the Court of Criminal Appeals insofar as it affirmed Smith’s conviction, reversed the judgment insofar as it affirmed Smith’s death sentence, and remanded the case for the Court of Criminal Appeals to order the trial court to conduct a new penalty-phase hearing. Ex parte Smith, 213 So.3d 214 (Ala.2003) (“Smith III”).
After the second penalty-phase hearing, the jury recommended by a vote of 10-2 that Smith be sentenced to death. The trial court again followed the jury’s recommendation and sentenced Smith to death. Smith appealed, arguing, in part, that because he is mentally retarded, he cannot be sentenced to death pursuant to Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (holding that the execution of a mentally retarded person is unconstitutional). The Court of Criminal Appeals concluded that Smith is mentally retarded and, therefore, that he is ineligible for the death penalty and directed the trial court to set aside Smith’s death sentence and to sentence him to life imprisonment without the possibility of parole. Smith v. State, 213 So.3d 226, 228 (Ala.Crim.App.2000) (opinion on return to third remand) (“Smith IV”). This Court reversed the Court of Criminal Appeals’ judgment and remanded the case for the Court of Criminal Appeals to order the trial court to conduct an Atkins hearing to determine whether Smith is mentally retarded and for the trial court to make specific findings of fact pursuant to Ex parte Perkins, 851 So.2d 453 (Ala.2002). Smith v. State, 213 So.3d 239 (Ala.2007) (“Smith V”). On remand, the trial court conducted an Atkins hearing and set out its findings of fact, concluding that Smith is not mentally retarded. On return to remand, the Court of Criminal Appeals affirmed the judgment of the trial court as to the issue of mental retardation and also as to the other issues Smith argued on appeal from his second penalty-phase *315 hearing. Smith v. State, 213 So.3d 255 (Ala.Crim.App.2000) (opinion on return to fourth remand) (“Smith VI”). Smith again petitioned this Court for certiorari review.
We granted Smith’s petition to consider three issues: (1) whether the Court of Criminal Appeals’ holding that the prosecutor’s striking all minority venire-members from Smith’s jury at his second penalty-phase hearing was not improper conflicts with Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and its progeny; (2) whether the Court of Criminal Appeals’ holding that no error occurred as a result of contact between relatives of one of the victims and the members of the jury venire conflicts with Turner v. Louisiana, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965), and Ex parte Pierce, 851 So.2d 606 (Ala.2000); and (3) whether the Court of Criminal Appeals’ affirmance of the trial court’s determination that Smith is not mentally retarded conflicts with Atkins and Perkins. We reverse and remand. Because of our resolution of issue two, we pretermit discussion of issue one.
I. Factual Background
In Smith VI, the Court of Criminal Appeals summarized the facts concerning the crime that was the basis of Smith’s conviction. Smith, a drug dealer, went to Flour-noy’s residence in Dothan around 8:30 p.m. on October 19, 1996, to collect $1,500 Flournoy owed him for crack cocaine. Flournoy told Smith he did not have the money then, but he would have it later that night. Smith left, but later that night, Smith and his girlfriend returned to Flour-noy’s residence. When they returned, Smith had a sawed-off .22-caliber rifle concealed under his shirt. Flournoy again said he did not have the money he owed Smith. Smith shot Flournoy, who was not armed, in the chest as Flournoy begged Smith not to shoot him. Smith then turned his weapon on the other occupants of the residence, none of whom was armed. He shot Helms six times in the chest as she tried to flee, and he shot Bennett in the head as he sat in a chair. Both died at the scene. Flournoy attempted to escape, but collapsed in his yard. He later died from the gunshot wound to his chest. Smith also attempted to shoot Derrick Gross, but the rifle jammed. As Smith and Gross wrestled with the rifle, Smith attempted to get a knife from his girlfriend, but Gross was able to escape. After the shootings, Smith fled the scene. He made arrangements for an acquaintance to hide the rifle, he changed clothes, and he attempted to hide from the police. He was apprehended the following morning at his father’s house. After being advised of his rights, he confessed to the murders. He also bragged to other inmates in the county jail that he would beat the capital-murder charge because of his mental condition, and he made statements that the murders were the result of a drug deal and that he intended to shoot everyone in Flournoy’s residence so there would be no witnesses to the murders.
At trial, Smith admitted shooting the three victims, but contended that he did not intend to kill them. He claimed that he was not “in his right mind” at the time of the shootings and that he just “snapped” because, he said, he had been on a binge, smoking crack cocaine and drinking alcohol; he was under duress because he owed his narcotics supplier $27,000, and the supplier had threatened to kill Smith’s mother if he did not get his money; and he was angry because Flour-noy had called his girlfriend a “whore” and a “bitch.”
II. Analysis
A. Determination of Mental Retardation
We first address Smith’s contention that the Court of Criminal Appeals’ affir- *316 manee of the trial court’s judgment concluding that he is not mentally retarded conflicts with Atkins and Perkins. If Smith is mentally retarded, then under Atkins he is not eligible for the death penalty.
The trial court, on remand from the Court of Criminal Appeals, held a hearing on April 24, 2008, on the issue whether Smith is mentally retarded. The trial court concluded that Smith “ ‘is not mentally retarded so as to prevent his execution for his multiple crimes.’” Smith VI, 213 So.3d at 267 (quoting the trial court’s order). The trial court relied on the testimony of Dr. Harry McClaren and Dr. Doug McKeown, both of whom concluded that Smith is not mentally retarded based upon intelligence tests and his social-adaptive functioning. Dr. McClaren stated that Smith had a full-scale IQ of 68; Dr. McKeown stated that he had reviewed reports of IQ tests on which Smith had scored 72 and 67. Smith’s full-scale IQ score did not show mental retardation. The trial court stated that ample evidence was presented at the hearing showing that Smith had the ability to function adequately in society as shown by his daily activities, his work history, and his ability to communicate. Specifically, the trial court said, Smith “ Svas able to maintain a bank account, to save money, to use medical terms that were not normal for mentally retarded persons to use, and his participation in daily activities and other work showed his planning and thought processes.’” Id. at 268 (quoting the trial court’s order). Dr. McClaren stated that Smith’s adaptive functioning was in the high borderline range or borderline range and concluded that Smith is not mentally retarded. He testified:
“ ‘No doubt, [Smith] had some IQ scores, in fact, all the IQ scores that I know in the school records that indicate school scores measured by IQ that would be indicative of mild mental retardation, if they were not spuriously lowered by things such as exposure to domestic violence, poverty, cultural deprivation, ethnicity, perhaps intoxication. He told me that he was accustomed to late elementary, early middle school years to take a half pint of gin to school and do that at recess. I can’t help to think that would have an adverse affect, if that was true, on his measured IQ’s, especially later on. Also, it was clear from talking to his brother, Jimmy, and directly observing one of his half brothers that he had been exposed to domestic violence of a serious nature as a young child, that he had a family history of depression, and had made suicide attempts in his life eating rat poison, attempting another time Jimmy told me—I had not heard of—he may have wanted to kill himself with exhaust fumes and also huffing gas.’ ”
Smith VI, 213 So.3d at 268 (quoting the trial court’s order). Dr, McClaren also stated that Smith’s substance abuse and other matters he testified about “ ‘would affect cognitive functioning such that the IQ becomes lower not because of retardation but because of these external influences.’ ” Id. The trial court concluded that there was “abundant evidence” to support its finding that Smith is not mentally retarded and that he therefore does not meet the legal criteria for ineligibility for the death penalty. See Atkins and Perkins.
Smith states that he was born with a genetic predisposition to mental retardation and that five members of his immediate family suffer from the same mental infirmity. As a child, he says, he was placed in classes for the educable mentally retarded, and he required assistance with many tasks while growing up. Smith further states that his retardation was accept *317 ed as a fact among those in the community in which he grew up and that there is no dispute that he is completely illiterate. Except for the State’s expert at the Atkins hearing, Smith says, every psychologist who has evaluated him, including the State’s initial expert, concluded that he is mentally retarded. His various IQ scores, which average 67.5, consistently place him in the mentally retarded range. He says that the only formal adaptive-behavior assessment of his mental state at the time of the offense revealed numerous adaptive deficits.
In Atkins, the United States Supreme Court stated:
“We are not persuaded that the execution of mentally retarded criminals will measurably advance the deterrent or the retributive purpose of the death penalty. Construing and applying the Eighth Amendment in the light of our ‘evolving standards of decency,’ we therefore conclude that such punishment is excessive and that the Constitution ‘places a substantive restriction on the State’s power to take the life’ of a mentally retarded offender. Ford [v. Wainwright], 477 U.S. [399], 405 [ (1986) ].”
536 U.S. at 321. The Supreme Court did not adopt a standardized definition of mental retardation in Atkins; it left that task to the states.
As the Court of Criminal Appeals noted, the Alabama Legislature has not yet enacted legislation addressing this issue. In Perkins, this Court adopted a definition of mental retardation by examining the definitions used by those states that have enacted such legislation.
“Those states with statutes prohibiting the execution of a mentally retarded defendant require that a defendant, to be considered mentally retarded, must have significantly subaverage intellectual functioning (an IQ of 70 or below), and significant or substantial deficits in adaptive behavior. Additionally, these problems must have manifested themselves during the developmental period (i.e., before the defendant reached age 18).”
851 So.2d at 456. In Smith V, this Court further discussed the criteria that must be met in order for a defendant to be considered mentally retarded:
“All three factors must be met in order for a person to be classified as mentally retarded for purposes of an Atkins claim. Implicit in the definition is that the subaverage intellectual functioning and the deficits in adaptive behavior must be present at the time the crime was committed as well as having manifested themselves before age 18. This conclusion finds support in examining the facts we found relevant in Ex parte Perkins and {Smith III], and finds further support in the Atkins decision itself, in which the United States Supreme Court noted: ‘The American Association on Mental Retardation (AAMR) defines mental retardation as follows: “Mental retardation refers to substantial limitations in present functioning.”’ 536 U.S. at 308 n. 3 (second emphasis added). Therefore, in order for an offender to be considered mentally retarded in the Atkins context, the offender must currently exhibit subaverage intellectual functioning, currently exhibit deficits in adaptive behavior, and these problems must have manifested themselves before the age of 18.”
Smith V, 213 So.3d at 248.
Smith says that after the Court of Criminal Appeals remanded his case for the trial court to conduct a hearing on the issue whether he was mentally retarded, he retained Dr. John Goff as his expert. *318 Smith states that Dr. Goff concluded that Smith meets all three prongs of the Perkins mental-retardation standard. The State’s expert, Dr. McClaren, concluded that Smith currently has an IQ in the mentally retarded range, that he suffers from an adaptive deficit, and that he likely was mentally retarded as a child. However, Smith says, Dr. McClaren refused to recognize a second, adulthood-adaptive deficit and therefore testified that Smith is not mentally retarded. The trial court relied on Dr. McClaren’s findings, as the Court of Criminal Appeals pointed out:
“It is clear that the circuit court chose to base its decision on Dr. McClaren’s testimony and not on Dr. Goffs testimony. The main difference in the two experts’ testimony was in the area of Smith’s ‘adaptive functioning.’ ... Dr. Goffs testimony appeared to focus on Smith’s historic mental health functioning and not his present functioning.
“However, in sharp contrast, Dr. McClaren’s testimony consisted of testimony related to Smith’s present mental functioning. He relied on his own contact with Smith as an adult, his contact with individuals who had had recent contact with Smith, and the evaluation of a correctional officer who had close contact with Smith while Smith was incarcerated.
“Also, Smith testified in his own behalf at the guilt phase of his trial, and the circuit court judge had the opportunity to observe Smith. We have reviewed Smith’s testimony, and we find no indication that Smith is mentally retarded based on the factors set out in Ex parte Perkins. Indeed, Smith appeared at times to be articulate.
“The circuit court’s conclusion that Smith is not mentally retarded is more than supported by the record. Accordingly, we affirm the circuit court’s finding. There is no constitutional bar to Smith’s sentence of death.”
Smith VI, 213 So.3d at 270-71.
Smith argues that in relying on the testimony of Dr. McClaren rather than that of Dr. Goff, the Court of Criminal Appeals placed more emphasis on his present-day adaptive functioning than on his adaptive functioning at the time of the offense. Thus, he argues, the Court of Criminal Appeals’ finding that he is not mentally retarded conflicts with Atkins and Perkins, both of which, he says, “recognize that a defendant’s level of functioning at the time of the offense is not only relevant to a mental retardation determination, but serves as the basis for the entire jurisprudence.” Petition, at 46. In Atkins, the United States Supreme Court stated:
“[Tjhere is abundant evidence that [the mentally retarded] often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders. Their deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability.”
536 U.S. at 318 (footnote omitted). Because Atkins is based on the defendant’s mental state at the time of the offense, Smith argues, evidence of his level of adaptive functioning at that time is as relevant, if not more so, than his current adaptive functioning in making a determination under Atkins as to whether he suffers from mental retardation so as to be ineligible for the death penalty. Appropriate consideration of the evidence presented, he maintains, would have established that he satisfies the Atkins standard.
The State points out that the trial court and the Court of Criminal Appeals had before them more than the testimony of Dr. Goff and Dr. McClaren. The State maintains that the record contains ample evidence demonstrating Smith’s ability to *319 function before, during, and after the murders. In brief in response to Smith’s petition for the writ certiorari, the State says:
“Several days before the crime, Smith was arrested by Headland Police Department Officer Ted Yost. When he was questioned by Officer Yost, Smith used a false name, Christopher Michael Turner. Smith was transported to the Headland Police Department, whereupon he told the officers that he needed to use the restroom. His request was granted, and he took advantage of that opportunity to escape from custody. Officer Yost did not learn Smith’s true identity until he was arrested on capital murder charges several days later. Smith’s ability to use a false name and escape from custody constitutes yet more evidence of his good adaptive functioning.
“Before he shot Mr. Flournoy on the evening of October 19, 1996, Smith told [his girlfriend] to move out of the way because he did not want her to get hurt during the commission of his crime. Smith then turned his attention to the other occupants of Mr. Flournoy’s house, Theresa Ann Helms, David Lee Bennett, and Derrick Gross. To eliminate the witnesses to his crime, Smith shot Ms. Helms and Mr. Bennett, both of whom were unarmed. Smith attempted to kill Mr. Gross, but he managed to escape. After the crime, Smith enlisted the help of one of his friends who agreed to hide the gun that he used to kill his three victims and then hid from law enforcement officers. Moreover, while he was awaiting trial at the Houston County jail, Smith bragged about his crime and told a fellow inmate, Kevin Bridges, that he was ‘going to get off on a mental plea.’ Smith’s criminal craftiness and his active involvement in an illegal interstate drug ring constitute yet more evidence that his adaptive functioning is higher than that of a mentally retarded person.”
State’s brief, at 92-93 (record references omitted).
In Smith V, this Court emphasized that the burden of proving a defendant’s mental retardation in an Atkins hearing is the defendant’s and that the trial court’s conclusions as to the defendant’s mental retardation are entitled to deference by an appellate court:
“In the context of an Atkins claim, the defendant has the burden of proving by a preponderance of the evidence that he or she is mentally retarded and thus ineligible for the death penalty. See Morrow v. State, 928 So.2d 315, 323 (Ala.Crim.App.2004); see also Holladay v. Campbell, 463 F.Supp.2d 1324, 1341 n. 21 (N.D.Ala.2006) (interpreting Alabama law to require that the defendant prove mental retardation by a preponderance of the evidence)....
[[Image here]]
“Based on all the evidence that has been presented, it is not clear that Smith is mentally retarded as a matter of law. As [then] Judge Shaw correctly stated: ‘Such a question involves a factual finding based on weight and credibility determinations, determinations that are better left in the first instance to the trial court, which had the opportunity to personally observe the witnesses and assess their credibility.’ [Smith IV], 213 So.3d at 239 (Shaw, J., dissenting).”
Smith V, 213 So.3d at 252-53.
After reviewing the trial court’s findings and conclusions, together with the opinion of the Court of Criminal Appeals affirming the trial court’s judgment, we conclude that there was sufficient evidence to support the trial court’s finding that Smith did not meet his burden of proving that he is *320 mentally retarded. Although it is clear that Smith has subaverage intellectual functioning as indicated by his IQ scores and that his intellectual deficits manifested themselves before he was 18 years old, all three Perkins factors must be proven in order for a person to be classified as mentally retarded for purposes of an Atkins claim, and Smith has not demonstrated significant or substantial deficits in adaptive behavior, either at the time the murders were committed or at the time of the hearing. We find especially persuasive Smith’s behavior during the commission of these murders. Smith arrived at Flour-noy’s house armed with a sawed-off rifle that he purposefully concealed, he systematically shot three victims, and he attempted to shoot a fourth victim and made an effort to stab that victim after the rifle jammed. He made the statement after the murders had been committed that he planned to kill everyone present in Flour-noy’s house to eliminate witnesses. These are not the impulsive actions of a mentally retarded person who cannot understand the consequences of his actions as contemplated by the United States Supreme Court in Atkins. Viewed from the perspective of Smith’s status at the time of the offense as well as at the time of the hearing, we conclude that the Court of Criminal Appeals properly affirmed the trial court’s finding that Smith is not mentally retarded. We further conclude that the Court of Criminal Appeals’ judgment does not conflict with Atkins and Perkins.
B. Interaction Between Relatives of One of the Victims and the Jury Venire
On the second day of voir dire questioning for the second penalty-phase hearing, Flournoy’s mother and his brother sat among the veniremembers in the courtroom for approximately 30 minutes while lawyers in the case argued motions before the trial court.[1] Those relatives remained seated with the veniremembers when voir dire questioning resumed. The lawyers who represented Smith at his first trial did not represent him at the second penalty-phase hearing; instead, he had new lawyers for that hearing who did not recognize Flournoy’s relatives. The prosecutor, however, was familiar with those relatives because they had testified for the State at Smith’s first trial and they were scheduled to testify at the second penalty-phase hearing. Although the prosecutor knew that Flournoy’s relatives were present and that they were not venire-members, he said nothing and took no steps to separate Flournoy’s relatives from the venire. During a question directed to one of the prospective jurors, one of Smith’s lawyers realized that relatives of one of the victims were seated in the courtroom with the venire and asked that they be excluded. The prosecutor responded that family members had a right to be present. The trial court asked which family members the lawyers were talking about, and, at that point, Smith’s lawyers asked to talk to the court out of the hearing of the venire. The following then occurred:
“MR. GARTLAN [one of Smith’s lawyers]: Judge, she just made a statement, she said, ‘He took my son’s life.’
“MR. VALESKA [prosecutor]: Who?
*321 “MR. CAPPS [another of Smith’s lawyers]: The lady on the second row said, ‘He needs to die, he took my son’s life.’ And I didn’t know she wasn’t a juror. And she is sitting out there—.
“MR. GARTLAN: She is sitting out there with the panel.
“MR. CAPPS: —and the jurors are on either side of her. And she’s making statements that he took my son’s life. We’ve been back there in the jury room for the last thirty or forty minutes doing motions, and she has been sitting out here with our jury. And there has been nobody to watch her. I don’t know what she has said. I move for a mistrial at this point. It’s highly inappropriate for the jury to be sitting with the victim’s family.
“MR. GARTLAN: Let the record reflect that the two family members that we’re talking about, we don’t even know their name. They just walked out of the courtroom with Mrs. Bates. And, again, they were sitting on the second row behind five jurors and in between three jurors and in front of five other jurors. So we don’t know. And I’ve observed conversations. I just assumed it was a juror commenting, shaking her head, agreeing or disagreeing with Mr. Capps’s voir dire. But it turns out, Judge, it’s a family member. And we don’t know what has been said to the other jurors on the panel.
“MR. CAPPS: And, Judge, I would state I believe it’s one of the victims’ mother, because she did make the comment, ‘He took the life of my son,- he deserves to die.’
“MR. GARTLAN: Judge, that is very inappropriate. How can a jury put that out of their mind?”
The prosecutor suggested that the trial court ask the veniremembers sitting near Flournoy’s relatives what they heard and, if they had heard a remark from a relative, whether that would cause them to have more sympathy for the victim’s family or whether they could put what they heard out of their minds. The trial court then asked the prospective jurors seated on the side of the courtroom where the relatives had been sitting whether any of them had heard any comments made by the relatives. One prospective juror stated: “She just kept repeating, ‘He took my son.’” The defense lawyers then asked the trial court to question the jurors individually. The trial court questioned two prospective jurors individually out of the presence of the other veniremembers. One prospective juror who was questioned' stated that he heard Flournoy's mother say “he took my son away,” but he stated that’he heard no other comments. Another prospective juror told the trial court that he heard Flournoy’s mother say “he took my son’s life,” but he also stated that he heard no other comments. The trial court then stated: “I think everybody out there heard the same thing. I think we ought to do it in a group.” The prosecutor agreed; the defense lawyers objected. The trial court then stated: “Well, if they heard anything different, they will tell us. But, apparently, that is the pattern.” The trial court then separated those veniremembers who had indicated they heard a comment made by Flournoy's relatives and stated:
“THE COURT: Okay. Let the record reflect that I am now in the presence of the jurors that raised their hands and said they heard something from one of the family [members] of the victim. And as I gather from talking to the first two, I think they heard about the same thing you did. I want to make sure that you did hear the same thing.
“And would I be reasonable to assume that y’all all heard the. statement from the lady that was sitting there to the *322 effect that he took my son’s life and he deserves to die? Is that what /all heard?”
One prospective juror, M.T., responded that she did not hear the comments, but said that Flournoy’s mother had spoken to her as they were entering the courthouse. The trial court stated that it would address M.T.’s situation later. The following then occurred:
“THE COURT: Other than [M.T.], did you all hear that comment?
“PROSPECTIVE JUROR: All I heard was ‘He killed my son.’ She repeated it twice. ‘Took my son’s life.’
“THE COURT: Okay. Let’s do it this way, who just heard that part of the comment?
“PROSPECTIVE JUROR: ‘He took my son’s life’?
“THE COURT: Right.
“[PROSPECTIVE JUROR]: I also heard, ‘He went in the house and took my son’s life.’
“THE COURT: Who heard the additional part about he deserves to die? Okay. Now, we’ve got one, two, three, four, five. What is your name?”
The trial court then obtained the names of all the prospective jurors who had heard the comments made by Flournoy’s mother and questioned them about whether they could remain objective even if they had heard her comments.
“THE COURT: Now, my question to all of you, in fact, is whether or not now, you know, those that even didn’t hear the last part, you’ve heard now from other jurors what the lady did, in fact, say, the complete statement, the fact that you heard that, does that affect you in any manner in this case? Can you still be fair, or would you be more sympathetic to the victim’s family because they made that statement? If it affects you whatsoever, that particular statement, in being fair and objective in this case, then, obviously, you cannot serve as a juror. And I would excuse you.”
None of the prospective jurors responded in the affirmative. The trial court then talked with the lawyers and M.T. about her conversation with Flournoy’s mother. None of the lawyers challenged M.T. at that time, but she was later excused for cause.
The following exchange then occurred between the trial court and the lawyers:
“MR. CAPPS [one of Smith’s lawyers]: Judge, can I come up and put something on the record.
“THE COURT: Yeah.
“MR. CAPPS: Judge, we’ve had an unusual occurrence here. And I want to renew my motion for mistrial. And it appeared there were twenty-one specific jurors that overheard some conversations in this case, which were highly inappropriate.
“We would also object to the method in which they were questioned. Some jurors evidently heard some things, and some jurors heard other things. And some jurors heard what I would represent to the Court regarding, ‘He deserves to die,’ and some jurors didn’t hear that part, which leads me to believe that there were some other conversations ongoing.
“We had, at least, half the panel that did hear the short version where she said, ‘He killed my son,’ I believe was the statement. And then some others, seven to eight, I believe, raised their hand that she stated, ‘He should die.’ Your Honor—
“THE COURT: How is that going to affect anything? Is that not a natural reaction that you would get from any victim? A juror would be expected to *323 hear something like that. And I imagine Mr. Valeska is going to put her on, and she’s going to testify to that. That is a legitimate thing she can say at the sentencing hearing.
“MR. CAPPS: Your Honor, it’s highly—
“THE COURT: How does that prejudice—when they are answering questions out there as to them beliefs and whatever, how—
“MR. CAPPS: I’ll be glad to tell you, Judge.
“THE COURT: Okay.
“MR. CAPPS: Here’s how, because if Mr. Valeska should ask the victim’s mother, do you believe Jerry Smith should die, that is objectionable. And I believe, Your Honor would sustain my objection, if he asked that question. And that question has already been asked and answered right here in front of the whole panel without an objection, without anything on the record to prevent it. They have already heard her statement that she believes this man should die. That is her opinion. That is an objectionable question. And it is not admissible. It can’t come in any other way. And it’s already come into this panel. So I would move for a mistrial.
“THE COURT: Okay. Mr. Valeska?
“MR. VALESKA [prosecutor]: I think the Court has cured it by bringing in those jurors and going over any questions they had about what they heard. They said it wouldn’t affect any of them. The only juror that had contact with the victim’s mother told the Court what she said outside the presence of all those other jurors. So I say that you have cured it. You have asked them. And they have said it will not affect them. So I don’t believe they are entitled to a mistrial.
“THE COURT: Motion for mistrial is denied.”
Five veniremembers ultimately served on Smith’s jury who had heard Flournoy’s mother make the comment to the effect that Smith killed her son and who heard the trial court twice repeat her comment that Smith deserved to die.
In examining this issue, the Court of Criminal Appeals applied the manifest-injustice standard governing mistrials. See Ex parte Thomas, 625 So.2d 1156, 1157 (Ala.1993) (noting that “a mistrial is a drastic remedy, to be used sparingly and only to prevent manifest injustice”). The court noted that all the prospective jurors indicated that the comments by Flournoy’s mother would not affect their ability to be impartial. The court then stated: “Based on the record before us we cannot say that the circuit court erred in denying Smith’s motion for a mistrial.” Smith VI, 213 So.3d at 278
Smith argues that the Court of Criminal Appeals’ conclusion that the trial court did not err in denying his motion for a mistrial conflicts with this Court’s decision in Pierce and the United States Supreme Court’s decision in Turner, both of which applied a standard of “inherent prejudice.” Smith argues that interactions with potential jurors by relatives of a victim such as those that occurred in this case should be reviewed under the inherent-prejudice standard and that the Court of Criminal Appeals’ failure to apply that standard was error. In Pierce, the sheriff, who was a key witness for the prosecution, also had contact with the members of the jury throughout the trial. The Court of Criminal Appeals found that Pierce had not shown that he suffered any actual injury by the sheriffs alleged improper contact with the jury. Three jurors testified that the sheriffs presence, actions, and conversations with them did not affect their ability to deliberate. This Court disagreed, stating:
*324 “Pierce need not prove he suffered actual prejudice. As the United States Supreme Court stated in Turner v. Louisiana, 379 U.S. at 473, ‘it would be blinking reality not to recognize the extreme prejudice inherent in this continual association throughout the trial between the jurors and ... key witnesses for the prosecution.’ ...
« ( >
“The Court of Criminal Appeals, in stating that Pierce must prove actual prejudice in order to be entitled to relief under Turner, relied on the dissent in Turner. However, based on the main opinion in Turner, we conclude that close and continual contact with the jury by a sheriff who is a key witness for the prosecution is necessarily prejudicial to the defendant.”
51 So.2d at 611-12
Smith likewise argues that the conduct of Flournoy’s relatives exposed potential jurors to events that wei-e inherently prejudicial to him and is therefore entitled to closer judicial scrutiny than that afforded under the manifest-injustice standard. In Estelle v. Williams, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976), the defendant was compelled to attend his trial dressed in prison attire. The United States Supreme Court stated:
“The actual impact of a particular practice on the judgment of jurors cannot always be fully determined. But this Court has left no doubt that the probability of deleterious effects on fundamental rights calls for close judicial scrutiny. Courts must do the best they can to evaluate the likely effects of a particular procedure, based on reason, principle, and common human experience.”
425 U.S. at 504 (citations omitted).
The State argues that a family member’s emotional outburst or comment during a trial does not mandate a finding of prejudice to the defendant. See Frazier v. State, 758 So.2d 577 (Ala.Crim.App.1999) (affirming the trial court’s denial of a motion for a mistrial after two of the victim’s relatives had an emotional outburst in front of the jury); Gaddy v. State, 698 So.2d 1100 (Ala.Crim.App.1995) (emotional outburst by a spectator or family member during a trial does not require reversal unless the rights of the defendant were prejudiced by the outburst); and McNair v. State, 653 So.2d 320 (Ala.Crim.App.1992) (rejecting the defendant’s claim that he was entitled to a new trial because the jury heard emotional outbursts or manifestations of grief from family members of the victim).
The State argues that Smith cannot show that he was prejudiced by the comments made by Flournoy’s mother because the trial court identified the potential jurors who had heard the comments, ascertained what they heard, and thoroughly questioned them to ensure that the comments would have no effect on their ability to serve as impartial jurors in the penalty-phase hearing. The State also contends that in the process of questioning the jurors about their ability to remain impartial, the trial court issued a curative instruction that clearly informed the venire-members that they must disregard the comments made by Flournoy’s mother and that they could not consider the comments in any way. The State also contends that it is significant that none of the venire-members who heard Flournoy’s mother make the comment to the effect that Smith deserved to die served on Smith’s jury.
We conclude that the situation with which we are presented in this case mandates the application of the inherent-preju *325 dice standard, under which Smith is not required to prove actual prejudice. Pierce, 851 So.2d at 611-12. Smith had already been convicted years before this Court ordered the second penalty-phase hearing; thus, the only issue to be decided by the jury that was being impaneled in Smith’s case was whether he should be sentenced to death or to life imprisonment without the possibility of parole. The comments by Flournoy’s mother not only identified her to members of the jury veni-re as the mother of one of the victims, but also let them know that in her opinion, Smith deserved to be sentenced to death, Those comments were heard by only a few members of the venire. Nevertheless, when the trial court decided to question in a group the veniremembers who heard any comment made by Flournoy’s mother after learning that two potential jurors had heard the same portion of the comments, the trial court published the entire statement made by Flournoy’s mother—that Smith took her son’s life and that he deserved to die—to all the members of the panel with whom she and Flournoy’s brother had been sitting. Smith’s counsel correctly argued to the trial court that interrogating Flournoy’s mother during the penalty-phase hearing as to her opinion concerning the imposition of the death penalty would have been inappropriate. See Ex parte McWilliams, 640 So.2d 1015, 1017 (Ala.1993).
The prosecutor knew Flournoy’s relatives, and, by remaining silent and allowing them to sit and converse with potential jurors who would be deciding Smith’s fate, the prosecutor facilitated the events by which Smith was inherently prejudiced. The trial court thereafter questioned the veniremembers about their ability to remain impartial after hearing the comments by Flournoy’s mother and also at least twice repeated those comments to the veniremembers who had heard only the comment to the effect that Smith took Flournoy’s life and had not heard the comment that Smith deserved to die. We disagree with the State that the trial court gave an effective curative instruction to the members of the jury venire. Under the circumstances here presented, the trial court’s attempt to rectify the damage done by the comments of Flournoy’s mother compounded the prejudice to Smith by publishing the comments to every member of the venire who was questioned about the comments.
As we did in Pierce, we hold that Smith was not required to prove actual prejudice or to prove the manifest injustice required for a mistrial.[2] Indeed, as the United States Supreme Court stated in Turner, “[I]t would be blinking reality not to recognize the extreme prejudice inherent” in allowing potential jurors to associate with relatives of one of the victims and to hear one of those relatives express her opinion as to the ultimate issue to be decided in the penalty-phase hearing—Smith’s sentence. We conclude that personal contact with and comments to the jury venire by Flournoy’s relatives was inherently prejudicial to Smith and that a third penalty-phase hearing must be held. At the point in this case in which the conduct prejudicial to Smith occurred, the jury had not yet been selected and the hearing had not *326 commenced. A new panel of prospective jurors could have been called with minimal delay. Allowing this hearing to go forward under the circumstances of this case was a waste of judicial resources. The third penalty-phase hearing that is now required will necessitate substantial delay and the expenditure of even more judicial resources, all of which could have been avoided.
In Ex parte Pilley, 789 So.2d 888 (Ala.2000), this Court reversed a judgment of the Court of Criminal Appeals in which that court affirmed the trial court’s denial of Pilleas request for a new trial after an assistant district attorney telephoned a potential juror to ascertain whether they knew each other. The potential juror contacted by the assistant district attorney ultimately served as the foreman of the jury that convicted Pilley and recommended that he be sentenced to death. In reversing the judgment of the Court of Criminal Appeals and ordering a new trial for Pilley, this Court stated:
“This murder trial was not anticipated to last for an inordinately long time. The presence of alternate jurors is hard to justify if the circumstances here presented did not warrant discharging the regular juror who had contact with [the assistant district attorney] and seating an alternate juror in his place. If this were a civil case with a substantial punitive-damages award, we would be deeply troubled by evidence of similar conduct by the partner of a plaintiffs attorney who was not himself involved in the trial of the case. Here, where the penalty is the maximum inflicted by law, death, we find such contact with a prospective juror by a member of the district attorney’s office intolerable. Given the circumstances of this case, we must conclude that Pilley is entitled to a new trial.”
789 So.2d at 893. Likewise, the situation that was allowed to occur in this case is difficult to justify. Under similar circumstances in a civil case with a substantial award of damages, if the plaintiffs lawyers had allowed members of the plaintiffs family to sit with potential jurors and express their opinion about the decision to be made by the jury, taking advantage of defense counsel’s lack of familiarity with members of the plaintiffs family, we would likewise be deeply troubled.
Smith was inherently prejudiced by the contact between the jury venire and Flour-noy’s relatives, and he therefore is entitled to a new penalty-phase hearing. The judgment of the Court of Criminal Appeals holding that the trial court did not err in proceeding with the hearing after learning of that contact conflicts with Turner and Pierce.
III. Conclusion
That aspect of the judgment of the Court of Criminal Appeals affirming the trial court’s determination that Smith is not mentally retarded is affirmed. That aspect of the judgment of the Court of Criminal Appeals affirming the trial court’s decision to continue with the penalty-phase hearing in this case after becoming aware of the comments to members of the venire by Flournoy’s mother is reversed, and the case is remanded for the Court of Criminal Appeals to remand the case to the trial court for a third penalty-phase hearing. Because we find that the contact between the relatives of one of the victims and the members of the jury veni-re requires a new penalty-phase hearing, we need not addi-ess Smith’s argument that the prosecutor’s use of his peremptory challenges to strike all the minority members of the jury venire conflicts with Batson and its progeny.
REVERSED AND REMANDED.
*327 WOODALL, STUART, SMITH, BOLIN, PARKER, and MURDOCK, JJ., concur.
COBB, C.J., and SHAW, J.,* recuse themselves.

. There is some confusion in the record as to whether two or three of Flournoy’s relatives were sitting with the jury venire, Two persons are discussed throughout this portion of the transcript, but the trial court also commented to the members of the venire that three relatives of one of the victims had recently left the courtroom. In another portion of the record, reference is made to two relatives leaving the courtroom with "Mrs. Bates.” The number of relatives is not critical to the Court's discussion of this issue; therefore, this opinion will hereinafter refer to Flournoy’s mother and his brother.

. The standard for a mistrial would not be applicable to this case, in which the hearing had not yet taken place. The procedure used after a successful Batson challenge, in which a new venire is called, could have expedited a final resolution of this case. See Ex parte Branch, 526 So.2d 609, 624 (Ala.1987) ("Finally, if the trial judge determines that there was discriminatory use of peremptory challenges, an appropriate remedy may be to dismiss that jury pool and start over with a new pool.... This remedy is not exclusive, however.”).